Filed 11/17/22  P. v. Bathum CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER J. BATHUM,<br><br>Defendant and Appellant. | B306784<br><br>Los Angeles County<br>Super. Ct. No. BA451669 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge. Affirmed.

Richard D. Miggins for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant and appellant Christopher Bathum owned a drug rehabilitation therapy network and held himself out as a therapist or counselor. A jury convicted him of multiple crimes against a number of the network's female clients, including rape, sexual penetration with a foreign object, forcible oral copulation, sexual exploitation, furnishing methamphetamine, and furnishing heroin. He was sentenced to a total of 52 years and 8 months in state prison.

Bathum contends his convictions should be reversed for many reasons. Among other things, he argues his convictions are not supported by substantial evidence; the trial court erred by denying his post-trial motions for relief based on an alleged *Brady* violation; defense counsel was ineffective in several respects; certain evidence should have been excluded at trial; and the trial court made several errors when instructing the jury.[1]

As discussed below, we conclude Bathum's contentions are all meritless. Accordingly, we affirm the judgment.

## PROCEDURAL BACKGROUND

In June 2017, the Los Angeles District Attorney filed an amended information charging Bathum with 50 crimes, as summarized in the chart below.

---

[1] Due to the number and nature of the convictions, and the numerous assertions of error, this opinion is lengthy, and unavoidably contains sexually explicit references.

| COUNT | CRIME | STATUTE | VICTIM |
|---|---|---|---|
| 1, 6 | Rape | Pen. Code[2], § 261, subd. (a)(2) | Hayley G. |
| 10 | Rape by use of drugs | § 261, subd. (a)(3) | Stephanie J. |
| 2, 5, 17, 20 | Sexual penetration by foreign object | § 289, subd. (a)(1)(A) | Hayley G. (Counts 2, 5) Amanda J. (Count 17) Dana R. (Count 20) |
| 3, 4 | Forcible oral copulation | Former § 288a, subd. (c)(2)(A) | Hayley G. (Counts 3,4) |
| 7-9, 11-14, 16, 18-19, 22, 23, 27, 29, 32-42, 49, 50 | Sexual exploitation | Bus. & Prof. Code, § 729, subd. (a) | Hayley G. (Counts 7-9) Stephanie J. (Counts 11-14, 16) Amanda J. (Counts 18-19) Alexxis A. (Count 22) Brittni J. (Counts 23, 49) Amanda S. (Count 27) |

2      All undesignated statutory references are to the Penal Code, with the exception of Business and Professions Code section 729, which is frequently referred to as "section 729."

| COUNT | CRIME | STATUTE | VICTIM |
|---|---|---|---|
| | | | Brittney D. (Count 29) Jennifer I. (Counts 32-42) Ruah D. (Count 50) |
| 15, 21, 26, 28, 31, 43-46, 48 | Furnishing methamphetamine | Health & Saf. Code, § 11379, subd. (a) | Not specified in information |
| 24, 25, 30, 47 | Furnishing heroin | Health & Saf. Code, § 11352, subd. (a) | Not specified in information |

The trial court dismissed counts 7 and 8 as barred by the statute of limitations before trial. Counts 41 and 42 were dismissed at the close of evidence as being outside the time alleged.

The jury deadlocked on counts 10, 17, and 20. It found Bathum not guilty on counts 13, 14, 23, 29, 35 through 40, 44, and 50. It convicted him on all the other counts. On counts 9, 11, 12, 16, 18, 19, 22, 27, 32 through 34, and 49, the jury found true the allegation he committed the offense of sexual exploitation against more than one victim.[3]

---

3     In the criminal justice system, people against whom crimes have been committed, including crimes of a sexual nature, are referred to as "victims." We understand and respect that some of those people may prefer other, more empowering descriptors, particularly when referring to themselves.

4

Bathum's sentence of 52 years and 8 months in state prison was calculated as follows: on counts 1 through 6, a high term of 8 years on each count, to be served consecutively; on count 11 (selected as the base count), a term of 16 months, to be served consecutively; on counts 18, 22, 27, 32, and 49, a term of 8 months (one-third the mid-term) on each count, to be served consecutively; on counts 9, 12, 16, 19, 33, and 34, a high term of 3 years on each count, to be served concurrently; on counts 15, 21, 26, 28, 31, 43, 45, 46, and 48, a high term of 4 years on each count, to be served concurrently; and on counts 24, 25, 30, and 47, a high term of 5 years on each count, to be served concurrently.

Bathum timely appealed.

## FACTUAL BACKGROUND

Bathum owned the multi-facility drug rehabilitation networks known as Community Recovery of Los Angeles (CRLA) and Community Recovery of Colorado (CRCO). Although not a licensed physician or psychotherapist, he led meetings with staff on client treatment teams and facilitated a weekly trauma therapy group, which clients were required to attend. He also led family constellation groups, where clients role-played to address issues in their familial relationships. In both groups, clients shared intimate details about their lives, such as their experiences with family, abuse, loss, and neglect. No other counselors or therapists assisted him in these sessions.

Bathum told clients he was a licensed or certified hypnotherapist and led hypnotherapy groups. In addition, Bathum facilitated weekly, spirituality-based sessions in a sweat lodge, which was a tent covered in blankets. During those sessions, Bathum led chants and prayers with a group of nine to ten clients. The tent was dark inside, and water was poured over

hot coals placed in a hole in the center of the tent to create a hot, steamy environment.

Bathum's convictions arose out of his interactions with 13 different clients between 2012 and 2016. Relevant portions of their testimony at trial are summarized below.

## A.    Hayley G. – Counts 1 through 6 and 9

Hayley G. checked into CRLA in September 2012 when she was addicted to Xanax. She met Bathum on her second day of treatment.

Sometime before February 2014, while still a CRLA client, Hayley became Bathum's personal assistant. Her duties included helping with paperwork, driving him to different CRLA facilities, and assisting him with renovation projects.

Hayley was involved in three incidents relevant to this appeal. The first occurred in February 2014, at a CRLA facility called Adams House. After running a group session and a staff meeting, Bathum told her that he wanted to show her the house next door because he intended to purchase it. He planned to have an office and open more therapy rooms there. About an hour before taking her into the house, Bathum gave Hayley Xanax, which she consumed.

Hayley and Bathum were alone in the house. After giving her a tour, Bathum led Hayley into a room. He sat down on the ground in the middle of the room and told her to sit with him. She complied, and Bathum began rubbing her shoulders. He took off his shirt and, upon his request, Hayley massaged his back, shoulders, and neck while he laid on his stomach.

After she massaged Bathum for a while, Hayley recalled her shirt came off, and Bathum took her bra off. He laid her down onto her stomach, massaged her back, and touched her breasts.

Subsequently, Hayley testified Bathum grabbed her and flipped her over onto her back. He then forced her to perform oral sex on him, digitally penetrated her, and had sexual intercourse with her. The details of her testimony relating to his use of force in accomplishing these sexual acts are discussed in section I.B below.

The second incident occurred either soon before or soon after the incident above, while Hayley and Bathum were driving through traffic on the freeway. While Hayley was driving, Bathum crawled from the front passenger seat into the backseat behind Hayley and began massaging her shoulders and temples. He then reached into her shirt, touched and stroked her breasts, and massaged and pinched her nipples under her bra. After touching her on her abdomen, Bathum touched Hayley on her vagina over her pants and unbuttoned her pants. He placed his hands into her pants, under her underwear, and stuck his fingers into her vagina.

The third incident occurred in March 2014, when Bathum asked Hayley to meet him at another home he intended to purchase, which later became the CRLA facility known as Summer Hill. She agreed and drove herself to the property. Kirsten Wallace, one of Bathum's assistants, and a real estate agent were also going to meet them there.

Bathum was alone at the property when she arrived, and he showed her around the house. Eventually, Bathum showed Hayley one of the bedrooms, which had a bed inside.

As they entered the room, Bathum undid his belt and removed his clothes from the waist down. He then grabbed Hayley by the arm and pushed her backwards onto the bed. She landed on her back, with her feet and legs dangling off the edge of

the bed. After removing Hayley's pants and underwear, Bathum performed oral sex on her, digitally penetrated her, and had sexual intercourse with her. Again, the details of her testimony on his use of force to accomplish these sexual acts are discussed in section I.B below.

## B.     Alexxis A. – Count 22

When Alexxis checked into CRLA at the end of August of 2014, she was addicted to opioids and heroin. She met Bathum in her first week of treatment while attending a group session in the sweat lodge.

While a CLRA client, Alexxis resided at a facility known as Lechuza. On at least three occasions, Bathum contacted her and asked her to meet him at the Summer Hill facility. He also invited her to his home more than once. In these meetings, they often discussed intimate details about her past.

On one occasion, Alexxis was alone with Bathum in his office at his home. At first, they were sitting next to each other on different chairs and looking at photographs on his computer. Afterwards, Bathum offered to lead Alexxis through a guided meditation.

Bathum asked Alexxis to move from her chair and sit on his chair between his legs. When she did, Bathum began whispering in her ear and massaging her arms. He continued to whisper while moving his hands up her arms, and then to her chest area. Bathum moved his hands from her chest to her breasts and touched and rubbed them under her shirt and bra. Alexxis ended the encounter by "mumbl[ing] something about going back outside and shimm[ying] away and off his lap."

8

## C.     Dana R. – Count 20

When Dana checked into CRCO in March 2015, she was addicted to heroin, methamphetamine, and Xanax. Five-and-a-half months after checking into CRCO, she was transferred to CRLA.

On an unspecified date, Bathum drove Dana and two of her friends, Melissa and Brittni J., to the Malibu Riviera Motel and rented a room. When the four of them entered the room, Dana saw Bathum holding a prescription pill bottle with his name on it containing methamphetamine. Bathum offered her some of the methamphetamine, and all four of them used it by injection. Later that night, Bathum left the room while the women remained.

The next night, Bathum returned to the motel. Brittni and Dana left the room and purchased heroin using money Bathum had given to them. When they returned, Melissa injected Bathum with the heroin. Shortly thereafter, Dana saw him displaying symptoms of overdosing. Brittni called 911. Dana hid behind the dumpster at the motel when the paramedics arrived. She saw them take Bathum away.

## D.     Brittni J. – Counts 24, 25, 26, and 49

Brittni checked into CRLA in April 2015. She was addicted to heroin and pain pills. After being a CRLA patient "for a little while[,]" Brittni was formally introduced to Bathum at a family day event.

Around September 2015, Bathum invited Brittni and her friend, Amanda S., to hang out with him at the Anza Hotel in Woodland Hills. The two of them drove to the hotel in Amanda's car and met him in a room.

Upon entering the room, Brittni and Amanda sat on the bed with Bathum and "talked for a minute." At that point, he took a bag of crystal methamphetamine out of his pocket and asked if they wanted to get high. Although Brittni had not seen crystal methamphetamine before, she testified either Bathum or Amanda told her that the substance he had was crystal methamphetamine.

Bathum placed the methamphetamine into a glass pipe and smoked it. He then passed it to Amanda, who smoked it, and passed it to Brittni. Brittni then smoked from the pipe.

After they passed the pipe around a couple times, Bathum told Brittni and Amanda that he wanted to do a meditation with them. Per his instruction, Brittni and Amanda laid down on the bed with him. Bathum was in the center between them, while Brittni was on his left side and Amanda was on his right side. Bathum told Brittni to close her eyes while listening to his words.

As Bathum was talking, Brittni felt him touching her leg with his hand. He proceeded to touch her on the stomach. Subsequently, he lifted her shirt up and groped her breasts under her bra. At that point, Brittni opened her eyes and saw Bathum "doing the same thing to Amanda."

Bathum then placed his hands down Brittni's pants and started rubbing her vagina over her underwear. Shortly thereafter, he went under her underwear and stuck his fingers into her vagina. While Bathum was touching her, Brittni saw him touching Amanda on her vagina. At some point, the incident ended. Bathum provided Brittni and Amanda with additional crystal methamphetamine, and both of them returned to the CRLA facility where they were residing.

Around Thanksgiving 2015, Bathum invited Brittni to the Four Seasons Hotel to hang out. When she arrived at the hotel room, she saw three other women whom she recognized. One of them was Brittney D. Brittni observed black tar heroin, crystal methamphetamine, needles, a glass pipe, and aluminum foil on a table. She injected and smoked the methamphetamine, as well the heroin.

Brittni testified that later, on an unspecified date, Bathum arranged for her, Melissa, and Dana R. to go to the Malibu Riviera Motel. When they arrived, Bathum was already there, and had booked a room.

After the three of them entered the motel room, Bathum took a medicine bottle containing crystal methamphetamine and a plastic bag containing black tar heroin out of his jacket pocket. Using needles, aluminum foil, and a pipe provided by Bathum, Brittni smoked and injected the methamphetamine and the heroin. That night, while Brittni was sitting on the bed, Bathum took off her underwear and put his mouth on her vagina. Either that same night or the night after, as noted above, Bathum overdosed on heroin Brittni had purchased with Dana R.

### E.    Amanda S. – Counts 27 and 28

Amanda S. checked into CRLA in May 2015. She was addicted to heroin and had done methamphetamine in the past. About six months after checking in, she and Brittni J. told Bathum they had been craving drugs and wanting to use them. A week later, he invited the two of them to the Anza Hotel. They accepted his invitation and drove to the hotel in Amanda's car.

Ten minutes after arriving to the hotel room Bathum had booked, Bathum opened a drawer on the nightstand to the left of the bed. Inside, Amanda saw a pill bottle containing

11

methamphetamine and "a meth pipe." Bathum loaded the pipe with the methamphetamine and smoked it. He passed the pipe to Amanda and Brittni, who both smoked from the pipe.

After they smoked, the three of them sat on the bed while talking about hypnosis and whether it really works. Bathum attempted to hypnotize Amanda and Brittni. During the hypnosis session, Amanda and Brittni were laying on their backs. Bathum held their hands while talking. About five minutes into the session, Amanda felt his hand caressing her vagina on the outside of her pants. Bathum touched her in this manner "for a minute or two." As he did so, her eyes were closed.

Bathum then placed his hand inside Amanda's pants. She opened her eyes, looked over to her left, and saw his other hand was in Brittni's pants. Bathum touched Amanda's vagina with his finger under her underwear.

## F.    Amy W. – Counts 47 and 48

Amy checked into CRLA in February 2015 and was a CRLA client for approximately 10 months. She was addicted to heroin and methamphetamine.

In June 2015, Amy sent Bathum a text message asking if he wanted to get high with her one last time, as she planned to check into a sober living facility unaffiliated with CRLA. He responded he would be at work until noon, and told Amy to meet at his house around that time.

Amy met Bathum at the guesthouse next to his home. After they sat down in the living room and talked for a bit, Bathum took out a bag with three orange medication bottles inside. One contained cocaine, another contained methamphetamine, and the third contained heroin. Bathum and Amy each snorted a line of

cocaine. They also smoked the methamphetamine and heroin off of tinfoil.

## G. Brittney D. – Count 30

Brittney D. checked into CRCO on November 2, 2015. She was addicted to opioids, Percocet, and heroin and had "dabbled with" methamphetamine in the past.

Twenty days into her treatment, Bathum contacted Brittney's girlfriend at the time, who was a nurse on staff at CRCO, and offered to pay her $500 to meet him at the Four Seasons Hotel in Los Angeles. Subsequently, Brittney and her girlfriend drove to the hotel with another client.

They arrived at the hotel on the night before Thanksgiving 2015. When they walked into the hotel room, Brittney D. saw black tar heroin and methamphetamine on the table. At Bathum's request, she injected him with methamphetamine. He told Brittney she could use as much of the drugs as she wanted. Shortly thereafter, she injected herself with heroin.

## H. Amanda J. – Counts 18 and 19

Amanda J. was a patient at CRLA from October 2015 to January 2016. She was addicted to alcohol.

On December 30, 2015, Amanda was working on a project when a CRLA site manager informed her that Bathum was going to purchase new reading glasses for her at Costco. She was instructed to get into a van with a few other clients who were going to go to an A.A. meeting, and to tell those clients she was meeting her mother at Costco to purchase reading glasses. At the time, her glasses were not broken or giving her any issues.

The van dropped Amanda off at Costco, where Bathum was pacing near the store entrance. After walking around inside the

store, he led her toward the exit. Amanda followed him, and they left the store. Outside, he said, "'Let's get in my car.'" Although she initially expressed feeling uncomfortable, she ultimately complied because she "realized [she was] not really getting out of this." In the car, Bathum stated they were going to the Four Seasons Hotel, where he had gotten a room.

When they entered the hotel room, Bathum started taking his clothes off. Upon his request, Amanda did the same and laid down on her back. At that point, Bathum placed his mouth on her vagina. Then, he put his fingers inside her vagina. When she told him "that's enough[,]" Bathum asked her to perform oral sex on him. She agreed and did so briefly. After the incident ended, Bathum drove her back to CRLA.

## I.    Mollie W. – Count 31

Mollie checked into CRLA at the end of 2015. She was addicted to heroin and methamphetamine.

In December 2015, Mollie went to the Anza Hotel in Calabasas. When she got to the hotel room, she saw one or two other people there, including Amanda S.

Bathum arrived shortly afterwards. He took an orange pill bottle with no labeling on it out from his jacket pocket and placed it on the dresser. The bottle contained methamphetamine. Subsequently, everyone in the room, including Mollie, smoked the methamphetamine using a pipe. She also injected Bathum with methamphetamine.

14

## J.     Jennifer I. – Counts 32 through 34 and 43[4]

Jennifer I. became a CRLA client in November 2013. She was addicted to a variety of drugs, including benzodiazepines, Xanax, Subutex, opiates, Dilaudid, and heroin. She also used cocaine "here and there." Jennifer met Bathum during her first week of treatment, and became his personal assistant about 60 days into treatment.

Between March 1 and April 30, 2014, while she was his assistant and a CRLA client, Jennifer and Bathum were involved in three incidents.

In the first incident, the two of them were driving to Bathum's home when they pulled over to the side of a road in Agoura Hills. Jennifer had previously told him she had been a dancer at a club. In the car, Bathum told Jennifer that he never had a lap dance or been to a club before, and asked her to give him a lap dance. She agreed and performed a lap dance on him as he sat in the passenger seat. As she did so, Bathum touched her breasts over and under her clothes.

During the second incident, Bathum attempted to hypnotize Jennifer while they were pulled over by the side of the road. Jennifer was sitting in the driver seat, and Bathum got into the backseat. After telling her to close her eyes and relax, he reached around her seat and groped her breasts over and under her clothes.

The third incident arose when Bathum told Jennifer and her sister Stephanie J., who was also a CRLA client, to meet him

---

4      Jennifer I. died shortly after testifying at the preliminary hearing. Her preliminary hearing testimony was read into the record at trial.

at the W Hotel. She and Stephanie drove to the hotel in her car. Bathum paid for a room in cash, and the three of them went to the room. There, Jennifer told him that she wanted heroin. He gave her money to purchase the drugs and left the hotel. She and Stephanie then left the hotel, purchased heroin and cocaine, and came back.

Bathum returned to the hotel room with a bag of methamphetamine. The three of them smoked and snorted the methamphetamine. Stephanie injected Bathum with heroin. Later that night, Jennifer and Stephanie took turns having sexual intercourse with Bathum.

### K.     Stephanie J. – Counts 11, 12, 15, and 16

Stephanie was a CRLA client in 2013. She was addicted to heroin.

Stephanie and Bathum were involved in three incidents relevant to this appeal. The first incident occurred during a group session in the sweat lodge. At the time, she "was wearing [her] bathing suit and something over it, probably a dress." When she went inside, Bathum asked Stephanie to sit next to him, and she agreed.

During the session, Bathum was sitting to Stephanie's left. While the tent's door was closed, she felt Bathum's hand rubbing the inside of her left thigh. He then used his fingers to trace the bottom rim of her bathing suit near her vagina. At that point, his fingers were "within an inch" of her vagina. She left the tent the next time the door opened.

The second incident arose when Bathum drove Stephanie and her sister, Jennifer I., to the W Hotel in Hollywood. After drinking at the hotel together for a couple of hours, Bathum stated he needed to go home and check on his family, but that he

16

would return with methamphetamine. They told him that if he was going to bring methamphetamine, they wanted heroin as well. Because he did not know where to find any heroin, he gave them money to purchase some.

Stephanie and Jennifer picked up the heroin, brought it back to the hotel, and used it intravenously. Subsequently, Bathum returned to the hotel room with a "plastic baggie" containing methamphetamine. Stephanie and Jennifer used the methamphetamine intravenously, and Stephanie injected Bathum with heroin. Stephanie testified that, later that night, "there [was] sex[ ] . . . between [her] and [Bathum.]" She also testified "there [was] sex between [Jennifer] and [Bathum.]"

The third incident took place at the Summer Hill facility during a family day event. Bathum asked Stephanie to meet him in his office. After they entered his office, he locked the door behind him. He led her through a small door behind his desk, into a space resembling an attic or closet with a mattress pad inside.

Bathum shut the small door and laid down on the mattress pad. He told Stephanie to lay down with him and pulled her down by her hand. They laid down together for about three hours, during which he dozed off several times.

Eventually, Bathum began to touch Stephanie. He started by "petting [her] head." Subsequently, he used one of his hands to push her head down toward his penis. When her head was close to his penis, he unzipped his pants and pulled down his pants and underwear. At that point, Stephanie "went with it" and performed oral sex on him.

17

## L. Erika B. – Count 45

Erika checked into CRLA in November or December 2013. She was addicted to heroin and methamphetamine.

In July 2014, Erika relapsed on heroin she had found in a book amongst her belongings. A couple weeks later, she told Bathum that she wanted to leave CRLA because, despite being in treatment for six months, she had relapsed and still wanted to get high all the time. Bathum asked whether she would stay if she could get high with him once a month in secret. Erika responded, "'Maybe.'"

Two days later, Bathum picked Erika up from her CRLA residence and took her to his house, where they went to his office. Bathum opened a drawer and removed an Altoid container containing what appeared to be three grams of crystal methamphetamine. Erika placed the methamphetamine on a piece of aluminum foil, heated it up with a lighter, and took turns inhaling the vapor using a straw with Bathum.

## M. Ruah A. – Count 46

Ruah A. checked into CRCO in December 2014. She was seeking treatment for depression and anxiety and had not done drugs before. Five months later, Ruah was transferred to CRLA.

Ruah developed a strong relationship with Bathum. She felt comfortable around him and opened up to him about a variety of personal matters, including her history of trauma and abuse. Although Ruah left CRLA after a couple of months, she returned two months later due to pressure from her parents. She began living at a CRLA sober living facility in August 2015.

While she was living at the sober living facility, Ruah told Bathum she was going through a lot of stress in her life. In

response, Bathum invited Ruah to his home and offered to conduct a hypnotherapy session with her.

When she got to his home, the two of them sat in his office and talked. Bathum told Ruah she was emotionally unstable, and that he wanted to do a hypnotherapy session with her. Further, he stated that "if [she] did . . . crystal, it would make [her] more open to  . . . [her] feelings and [her] spirituality[.]" At that point, Ruah saw Bathum had made lines of crystal methamphetamine under his keyboard. They each snorted one of the lines using a hollowed-out Bic pen. He then unsuccessfully attempted to hypnotize her.

## DISCUSSION

### I. Sufficiency of Evidence – Bathum's Use of Force to Accomplish Sexual Acts with Hayley G.

#### A. Governing Principles and Standard of Review

##### 1. Use of Force to Accomplish Sexual Acts

For a defendant to be convicted of rape under section 261, subdivision (a)(2), forcible sexual penetration under section 289, subdivision (a)(1)(A), or forcible oral copulation under former section 288a subdivision (c)(2)(A), the prosecution must prove the defendant accomplished the relevant sexual act or acts "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" on the victim or another person. (§ 261, subd. (a)(2); § 289, subd. (a)(1)(A); former § 288a, subd. (c)(2)(A).)

In *People v. Griffin* (2004) 33 Cal.4th 1015 (*Griffin*), our Supreme Court "examined the force necessary for forcible rape under section 261, subdivision (a)(2), rejecting the argument that the offense requires the use of physical force substantially

19

different from or substantially greater than that necessary to accomplish an act of consensual sexual intercourse." (*People v. McCann* (2019) 41 Cal.App.5th 149, 155-156, citing *Griffin*, *supra*, at pp. 1018-1019.) The Supreme Court noted that "it has long been recognized that 'in order to establish force within the meaning of [the rape statute], the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim]. [Citation.]" (*Griffin*, *supra*, at pp. 1023-1024.) After examining the rape statute's evolution and legislative history, as well as the then-existing case law on the issue, the Supreme Court held: "The gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim's will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. As reflected in the surveyed case law, in a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. The Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction. [Citation.] Nor has the rape law ever sought to quantify the amount of force necessary to establish the crime of forcible rape . . . ." (*Id.* at pp. 1027-1028, italics in original.)

Accordingly, when evaluating whether the defendant has used "force" within the meaning of section 261, subdivision (a)(2),

"[t]he question for the jury [is] . . . simply whether [the] defendant used forced to accomplish intercourse with [the victim] against [his or her] will, not whether the force [the defendant] used overcame [the victim's] physical strength or ability to resist [the defendant]." (*Griffin*, *supra*, 33 Cal.4th at p. 1028.)

Applying *Griffin*, California appellate courts have held that the force required for sexual penetration under section 289, subdivision (a), and for oral copulation under former section 288a, is force which is sufficient to overcome the victim's will. (See *People v. McCann*, *supra*, 41 Cal.App.5th at p. 156 [applying *Griffin* to section 289]; *People v. Guido* (2005) 125 Cal.App.4th 566, 575-576 [applying *Griffin* to former section 288a].)

## 2. Appellate Review of Sufficiency of Evidence Underlying a Conviction

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).) "It is well settled that 'unless the testimony is physically impossible or inherently improbable,

testimony of a single witness is sufficient to support a conviction.' [Citation.]" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.)

Thus, "[o]ur power as an appellate court begins and ends with the determination whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, to support the judgment. [Citation.] The test on appeal is not whether we believe the evidence at trial established the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.) "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming . . . insufficient evidence' to support a conviction. [Citation.]" (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

### B.     Analysis

Bathum contends his convictions on counts 1 through 6 must be reversed because there was insufficient evidence showing he accomplished the sexual acts with Hayley G. at Adams House and Summer Hill by way of force. In support of his position, Bathum asserts Hayley never objected—verbally or physically—to any of the acts, that he did not attack or strike Hayley, and that he did not physically restrain her or manipulate any parts of her body against her will to accomplish the acts.

We disagree with Bathum's argument. Applying the legal principles and deferential standard of review set forth above, we conclude the record contains substantial evidence from which a reasonable trier of fact could find that, beyond a reasonable doubt, he accomplished the relevant sexual acts by way of force.

With respect to the Adams House incident, Hayley testified that after massaging her back and breasts while she was laying

22

on her stomach, Bathum grabbed her and flipped her over onto her back. According to Hayley, he placed one of his hands on the back of the upper part of her neck, pushed her head down toward his groin, and "shoved his penis in[to] her mouth." Bathum placed his other hand on her shoulder, and then her neck. With both hands tightly gripped on the back of her neck, Bathum controlled where her neck was going. Hayley testified she did not move her head to Bathum's penis on her own, that he had "directed [her] to do" what she was doing , and that she felt she did not have control over the movement of her head. While his penis was in her mouth, she squirmed, moving her hips and upper body around, but was unable to break free.

Hayley testified Bathum then flipped over, placed his forearm in a 90-degree bend, pressed it against her upper chest just below her neck and collarbone, and pushed her back to the ground, applying sufficient pressure to cause her pain and make it difficult for her to breathe. Feeling all of Bathum's weight on her, and the pressure on her chest from his arm, Hayley felt "nailed to the floor." Bathum took off her clothing from the waist down. He kept his arm across her chest, although he did move it slightly lower, as he performed oral sex on her.

After Bathum penetrated her vagina with his fingers, she was "slightly crying" and told Bathum: "'I'm not feeling good. I don't know what to do. I can't – I'm not feeling good.'" Although Hayley was sure he had heard her, he did not respond and instead put his penis in her vagina. She testified that she squirmed throughout the time he was having intercourse with her, moving her hips and upper body to "tell him [her]self that 'this isn't right,' [and] to try to . . . break from it." Nonetheless,

she was unable to break free from Bathum because he "had tight grips on [her]."

Hayley testified Bathum was more aggressive during the Summer Hill incident, and that he took control right as they entered the bedroom in the house. Bathum grabbed Hayley by the arm and pushed her backwards onto the bed. When he took her clothes off from the waist-down, Hayley said, "'I don't want to do this[,]'" because Kirsten and the real estate agent could arrive at any minute. Using one of his hands, he alternated between holding her down by the chest and touching her breasts while he had oral sex with her. As he did so, Hayley was wiggling and crying to herself.

After digitally penetrating her, Bathum again placed his forearm, bent in a 90-degree angle, across her chest beneath the collarbone and had sexual intercourse with her. He placed his other arm on her lower back and used it to lift her and "grab[ ] [her] towards him[ ]" in a "forceful" manner. While Bathum was having intercourse with her, Hayley was squirming and crying softly to herself with a blank facial expression and tears coming down her face.

Viewing the evidence above in the light most favorable to the judgment, we conclude a rational trier of fact could find that, beyond a reasonable doubt, Bathum accomplished the sexual acts underlying counts 1 through 6 through the use of "force sufficient to overcome [Hayley's] will." (*Griffin*, *supra*, 33 Cal.4th at p. 1027.) Accordingly, the record contains substantial evidence to support a finding that Bathum used "force" as required under section 261, subdivision (a)(2), section 289, subdivision (a)(1)(A), and former section 288a, subdivision (c)(2)(A).

## II. Sufficiency of Evidence – Actual and Reasonable Belief Hayley G. Consented to Sexual Acts

### A. Governing Principles

In *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*), our Supreme Court "held that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. [Citation.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360.)

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse." (*People v. Williams*, *supra*, 4 Cal.4th at pp. 360-361, fn omitted.) "In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances." (*Id.* at p. 361.)

To obtain a *Mayberry* instruction, the defendant must show there is "substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*People v. Williams*, *supra*, 4 Cal.4th at p. 362.) Once the defendant has done so, and the trial court has given a *Mayberry* instruction, the prosecution bears the burden of proving the defendant did not actually and reasonably believe the victim consented. (CALCRIM. Nos. 1000, 1015, 1045.)

### B. Analysis

Bathum contends his convictions on counts 1 through 6 must be reversed because there was insufficient evidence showing he did not actually and reasonably believe Hayley consented to the sexual acts during the Adams House and

Summer Hill incidents. In support of his position, he largely reiterates she did not object—physically or verbally—to any of the acts during either incident.

We are not persuaded by Bathum's argument. Viewed in the light most favorable to the judgment, the evidence discussed in section I.B above demonstrates that during both incidents: (1) Bathum ignored Hayley's verbal statements indicating she did not want to engage in sexual activities with him; (2) she was squirming around and moving her body in an effort to break free from Bathum; (3) Bathum held her down by placing his forearm bent in a 90-degree angle across her chest, just beneath her collarbone; and (4) Hayley was crying as he engaged in the sexual acts with her. In addition, during the Adams Hill incident, Bathum used his hand to push her head down toward his penis, shoved his penis into her mouth, and tightly gripped her neck while controlling where it went. Further, during the Summer Hill incident, Bathum used his hand to hold Hayley down by the chest while he orally copulated her.

Under these circumstances, we conclude that the record contains substantial evidence from which a rational trier of fact could conclude that, beyond a reasonable doubt, Bathum did not actually or reasonably believe Hayley consented to the sexual acts underlying his convictions on counts 1 through 6.

III.   **Sufficiency of Evidence – Sexual Exploitation Under Business and Professions Code Section 729**

A.   **Governing Statutory Authority**

Business and Professions Code section 729, subdivision (a) provides, in relevant part: "[A]ny person holding himself or herself out to be a physician and surgeon, psychotherapist, or

alcohol and drug abuse counselor, who engages in an act of sexual intercourse, sodomy, oral copulation, or sexual contact with a patient or client, . . . is guilty of sexual exploitation by a physician and surgeon, psychotherapist, or alcohol and drug abuse counselor."

**B.      Sufficiency of Evidence Showing Bathum had Sexual Intercourse with Stephanie J. at the W Hotel**

Bathum contends count 12 must be reversed because the evidence did not demonstrate he engaged in "sexual intercourse" or "sexual contact" with Stephanie within the meaning of section 729 while they were at the W Hotel. He notes that although Stephanie testified "she and [Bathum] had 'sex[,]'" she did not "testify about what 'sex' entailed[.]" Accordingly, he suggests that, in the context of Stephanie's testimony, "'sex' could have been sucking [Bathum's] toes or whipping him." He therefore contends Stephanie's "vague and non-specific[ ]" testimony is "fatal to [his] conviction[.]"

Bathum correctly observes that Stephanie did not expressly specify what "sex" entailed when testifying about the incident at the W Hotel. Nevertheless, we conclude his argument is unavailing. As the Attorney General points out, the record contains substantial evidence to support a finding that, beyond a reasonable doubt, he and Stephanie engaged in sexual intercourse during that incident.

Stephanie's testimony regarding a prior incident at a hotel by Venice Beach[5] sheds light on what she meant when she

---

5      Count 10, on which the jury deadlocked, was predicated on this incident.

testified "there [was] sex . . . between [her] and [Bathum]" at the W Hotel. Stephanie testified that, while at the Venice Beach hotel with Bathum and Jennifer I., she passed out during the evening, as she had consumed a substantial amount of alcohol earlier that afternoon. Throughout the night, she was in and out of consciousness, and could only recall "snapshots" of what happened. At some point during the night, while Stephanie was laying on her back, she "felt [Bathum] on top of [her] having sex with [her] body[,]" and that he was "[m]oving back and forth like they do when they are having sex." She testified she felt "[h]is penis go in and out of [her]" while he was "thrusting" with his body.

Stephanie's testimony about the W Hotel incident is further clarified by Jennifer I.'s testimony about the same incident. Jennifer testified she and Stephanie "took turns having sex with [Bathum] in t[he] same bed" in the hotel room. Immediately thereafter, Jennifer clarified that by "sex" she meant that "[Bathum's] penis would go in [her] vagina."

In sum, on the record before us, viewed in the light most favorable to the judgment, we conclude there is substantial evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, Bathum had "sexual intercourse" with Stephanie as required to sustain a conviction under section 729. (See Bus. & Prof. Code, § 729, subd. (a).)

**C.    Sufficiency of Evidence Showing Bathum had "Sexual Contact" with Stephanie J. in the Sweat Lodge**

As noted above, in order to prove guilt under section 729, the prosecution must show the defendant "engage[d] in an act of sexual intercourse, sodomy, oral copulation, or sexual contact

28

with a patient or client[.]" (Bus. & Prof. Code, § 729, subd. (a).) For purposes of section 729, subdivision (a), "'[s]exual contact' means sexual intercourse or the touching of an intimate part of a patient for the purpose of sexual arousal, gratification, or abuse." (*Id.*, subd. (c)(3).) Moreover, for purposes of section 729, the words "'[i]ntimate part' and 'touching' have the same meanings as defined in Section 243.4 of the Penal Code." (*Id.*, subd. (c)(4).) Section 243.4, subdivision (g)(1) defines "'[i]ntimate part'" as "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female."

Bathum contends his conviction on count 11 is unsupported by the evidence because the prosecution did not show he had "sexual contact" with Stephanie in the sweat lodge. He asserts he only rubbed her thigh and did not touch her vagina during the incident. Thus, he argues that because Stephanie's thigh is not an "intimate part" of her body for purposes of section 729, his conviction on count 11 must be reversed.

In response, the Attorney General argues Bathum's conviction on count 11 must be affirmed because the evidence shows he touched Stephanie on the groin, and therefore establishes he engaged in an act of "sexual contact" with her within the meaning of section 729, subdivision (c)(3).

This issue turns on the meaning of the word "groin." As the Attorney General points out, neither the Legislature nor other California appellate courts have defined the word "groin" for purposes of section 729 or any other related statutes. Thus, we apply the well-settled principle that, when interpreting a statute, "'"'[w]e begin by examining the statute's words, giving them a plain and commonsense meaning.'"' [Citation.]" (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; see also *MacIsaac v. Waste*

*Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083 (*MacIsaac*) ["We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning. [Citations.]"].) "'When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word.' [Citation.]" (*T-Mobile West LLC v. City and County of San Francisco* (2016) 3 Cal.App.5th 334, 352 (*T-Mobile*).)

Merriam-Webster's online dictionary defines "groin" as "the fold or depression marking the juncture of the lower abdomen and the inner part of the thigh[.]" (Merriam-Webster.com Dictionary (2022) <https://www.merriam-webster.com/dictionary/groin> [as of Oct. 24, 2022], archived at <https://perma.cc/J4FE-US7U>.) Similarly, another online dictionary defines "groin" as: "1. *Anatomy*. [T]he fold or hollow on either side of the front of the body where the thigh joins the abdomen. [¶] 2. [T]he general region of this fold or hollow." (Collins English Dictionary - Complete & Unabridged 2012 Digital Edition (2022) <https://www.dictionary.com/browse/groin> [as of Oct. 24, 2022], archived at <https://perma.cc/7M3S-5M3Q>.) Stedman's Medical Dictionary likewise defines "groin" as: "1. Topographic area of the inferior abdomen related to the inguinal canal, lateral to the pubic region. [¶] . . . [¶] 2. Sometimes used to indicate only the crease in the junction of the thigh with the trunk." (Stedman's Medical Dict. (online ed. 2014).)

Applying these definitions alongside the deferential standard of review governing the sufficiency of the evidence underlying a criminal conviction, we conclude the record contains sufficient evidence to support a finding that Bathum touched

Stephanie on her groin in the sweat lodge. Stephanie testified Bathum began by touching her on the inside of her left thigh, and then traced along the bottom rim of her bathing suit near her vagina with his fingers. As he did so, his fingers were "within an inch" of her vagina. Based on this testimony, a rational trier of fact could find that, beyond a reasonable doubt, Bathum engaged in an act of "sexual contact" with Stephanie in the sweat lodge as required under section 729.

### D.    Whether Bathum had "Sexual Contact" with Stephanie J. in His Office

Bathum contends there is insufficient evidence showing he engaged in "sexual contact" with Stephanie J. within the meaning of section 729 when she performed oral sex on him in his office. In support of his position, he emphasizes that pursuant to section 729, subdivision (c)(3), "'[s]exual contact' means sexual intercourse or the touching of an intimate part *of a patient*[.]" (Bus. & Prof. Code, § 729, subd. (c)(3), italics added.) Relying on that statutory language and *Roy v. Superior Court* (2011) 198 Cal.App.4th 1337 (*Roy*), Bathum contends a defendant may only be convicted of violating section 729 when "the touching of an intimate part of the patient's body, not the body of the doctor[,]" has been shown. Consequently, he asserts that because "[n]either [his] penis nor Stephanie's mouth is an intimate part of Stephanie's body[,]" his conviction on count 16 must be reversed.

Bathum's argument fails because count 16 was not based on the theory that he had "sexual contact" with Stephanie as defined by section 729, subdivision (c)(3). Instead, at trial, the prosecution's comments during closing argument reflect count 16 was predicated on Bathum engaging in an act of oral copulation with Stephanie. Under the plain language of section 729,

31

subdivision (a), acts of "oral copulation" are separate and distinct from acts of "sexual contact[.]" (See Bus. & Prof. Code, § 729, subd. (a).) As Bathum observes, section 729 restricts liability based on acts of "sexual contact" to situations where the *defendant* touches an intimate part of the *victim*. (See *id.*, subd. (c)(3).) The statute, however, does not contain similar language indicating a defendant is liable for sexual exploitation based on acts of "oral copulation" only where the defendant has orally copulated the victim, and not the other way around. (See, generally, Bus. & Prof. Code, § 729.)

*Roy*, *supra*, 198 Cal.App.4th 1337, is inapplicable. There, the appellate court was tasked with "ascertain[ing] what the Legislature meant by the term 'sexual relations[ ]'" in Business and Professions Code section 726. (*Roy*, *supra*, at pp. 1349.) At the time, that statute read, in relevant part: "The commission of any act of sexual abuse, misconduct, or *relations* with a patient, client, or customer constitutes unprofessional conduct and grounds for disciplinary action for any person licensed under this division . . . ." (Former Bus. & Prof. Code, § 726, italics added.)

Ultimately, the appellate court "reject[ed] the idea that [the petitioner] was exempt from discipline under [Business and Professions Code] section 726 unless he was the giver and not merely the recipient of sexually intimate contact with his patient." (*Roy*, *supra*, 198 Cal.App.4th at p. 1353.) In so doing, the appellate court explained: "Because the Legislature retained the broad, general term 'sexual relations' as a ground for disciplinary action in [Business and Professions Code] section 726, while employing the narrower and more strictly defined term 'sexual contact' as a predicate for criminal liability upon the same class of practitioners, we must presume it intended the

32

terms to mean two different things. [¶] Acceptance of [the petitioner's] claim that a unilateral, unreciprocated sexual fondling of a physician by a patient does not fall within the definition of 'sexual relations' would compel the conclusion that the Legislature meant 'sexual relations' and 'sexual contact' to have the *same meaning*, despite the Legislature's use of two different terms within the same statutory framework. Such a hypothesis is contrary to the settled rule that '[w]hen the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings.' [Citation.]" (*Id.* at p. 1352, italics in original.)

In short, the appellate court in *Roy* looked to section 729's definition of "sexual contact" for guidance when interpreting the term "sexual relations" in Business and Professions Code section 726. (See *Roy*, *supra*, 198 Cal.App.4th at pp. 1351-1353.) The court did not interpret the meaning of "oral copulation" under section 729. (See *ibid.*) Nor did it hold or otherwise suggest criminal liability for "oral copulation" under section 729 arises only where the defendant copulates the victim. (See *ibid.*)

Accordingly, for the reasons discussed above, we conclude the record contains substantial evidence from which a rational trier of fact could find that, beyond a reasonable doubt, Bathum engaged in a prohibited act of "oral copulation" with Stephanie J. in his office at Summer Hill. (Bus. & Prof. Code, § 729, subd. (a).)

### E. Whether Bathum had "Sexual Contact" with Amanda J. at the Four Seasons Hotel

Counts 18 and 19 pertained to an encounter at the Four Seasons Hotel, during which Bathum and Amanda J. performed oral sex on each other, and Bathum digitally penetrated Amanda. Bathum argues that because the prosecution did not identify the

33

specific acts on which counts 18 and 19 were based, and only referred to the incident as a whole in arguing his guilt on those counts, "[i]t is possible [Amanda's] oral copulation of [Bathum] could have been the sex act the jury found supported both counts." Reiterating that a patient's oral copulation of a defendant is not a "qualifying act[ ]" giving rise to liability under section 729, he contends his convictions on counts 18 and 19 must be reversed.

Bathum's argument is without merit. As discussed in section III.D above, Bathum has not shown that a defendant may be convicted of sexual exploitation under section 729 based on an act of "oral copulation" only where the defendant orally copulates the patient, and not the other way around.

### F. Sufficiency of Evidence Showing Bathum Held Himself Out as a Psychotherapist or Drug/Alcohol Abuse Counselor

Bathum contends all of his convictions for sexual exploitation must be reversed because the evidence did not show he held himself out to be a therapist or counselor within the meaning of section 729, subdivision (a). In support of his position, he asserts no witness testified he put up any signs indicating he was a therapist or counselor, that he was listed as a therapist or counselor on any CRLA rosters, that he had business cards indicating he was a therapist or counselor, or that any other therapists or counselors testified he held such a position. He also notes several witnesses did not believe he was a therapist or counselor. And, while he acknowledges multiple witnesses did believe he was a therapist or counselor, he contends "[n]one of [their] beliefs or assumptions establish [the disputed] element."

34

Bathum's argument is unavailing. As discussed below, the record contains ample evidence from which a rational trier of fact could find, beyond a reasonable doubt, Bathum held himself out as a psychotherapist and/or drug and alcohol abuse counselor.

We begin our analysis by noting the Legislature did not define the phrase "holding [one]self . . . out" for purposes of section 729. (See Bus. & Prof. Code, § 729.) Thus, we again turn to the dictionary to "ascertain the ordinary, usual meaning of [the phrase]" (*T-Mobile*, *supra*, 3 Cal.App.5th at p. 352) in order to "give the words of the statute 'a plain and commonsense meaning[.]'" (*MacIsaac*, *supra*, 134 Cal.App.4th at p. 1083.)

Merriam-Webster's online dictionary defines the phrase "hold out" as "to represent to be[.]" ((Merriam-Webster.com Dictionary (2022) <https://www.merriam-webster.com/dictionary/hold%20out> [As of Oct. 24, 2022], archived at <https://perma.cc/HD9B-HDLN>.) Similarly, Black's Law Dictionary defines the phrase "hold out" as follows: "To represent (something) as true . . . ; esp., to represent (oneself or another) as having a certain legal status[.]" (Black's Law Dictionary (11th ed. Online 2019).)

Applying these definitions alongside the deferential standard of review governing the sufficiency of the evidence underlying a criminal conviction, we conclude the record contains substantial evidence to support a finding that Bathum held himself out as a psychotherapist and/or a drug and alcohol abuse treatment counselor. First, numerous witnesses, including eight former CRLA clients[6] and Samantha Wood, a former CRLA therapist, testified Bathum led trauma therapy groups. No other

6    The former clients were Stephanie J., Amanda J., Amanda S., Jennifer I., Brittni J., Mollie W., Amy W., and Erika B.

therapists or counselors assisted him in doing so. He facilitated discussions by asking clients to share intimate details about their past and their relationships with their parents. In so doing, he sought to expose how those relationships related to the clients' struggles with addiction. Clients responded to his questions by sharing deeply personal information, including their experiences with loss, abuse, and their relationships with their parents. Bathum asked clients to explore and process their feelings on his selected topics.

Bathum also led family constellation groups. Wood testified that in those groups, clients would select other participants to represent their family members, and would role-play with them to address issues giving rise to trauma in their relationships with those family members. Similar to the trauma group, clients shared highly personal and intimate details about their pasts and their familial relationships during family constellation groups.

Wood testified Bathum provided clients psychoeducation[7] and emotional support during the groups he facilitated. According to Wood, those services are typically provided by a therapist or a counselor. She also testified that, given the delicate nature of the topics and issues discussed in trauma and family constellation groups, individuals leading those groups should be licensed or pre-licensed mental health professionals.

Bathum's interactions with clients were not limited to group sessions. Stephanie J. testified that Bathum held individual sessions with clients. Erika B. testified he offered to do

---

7    According to Woods, "psychoeducation" involves "educating somebody about psychological principles[ ]" in various different ways. For example, an individual providing psychoeducation may explain the grieving process.

one-on-one therapy with her to help her work through issues relating to her relationship with her father. Hayley testified Bathum told her he was a therapist, hypnotherapist, and a psychiatrist. In a conversation wherein Hayley was exploring issues underlying her addiction, Bathum told her she had multiple personalities and was struggling with depression.

Wood testified Bathum occasionally followed up with clients individually and/or with their families in a separate room after facilitating family constellation groups. She also testified that in addition to providing group therapy, Bathum also provided family therapy. Similarly, Ruah's mother testified Bathum led family therapy sessions, in which he talked about how the brain worked and how drugs affected the brain. He also advised her on how to communicate with her children and navigate her relationships with them.

Besides leading sessions with clients and their families, Bathum also spoke at family day events on weekends. Amanda J.'s mother testified she first saw Bathum at a family day, where he was giving a lecture to clients and their parents on "sobriety, getting clean, being clean, what it takes to stay clean, [and] the effects of alcohol and the effects of drug use." He also spoke about "different therapies[,] . . . different . . . attitudes[,] . . . different ways of staying sober[,] and different effects of not staying sober." Based on his lecture, Amanda J.'s mother testified Bathum "seemed like an expert" and her impression of him was that "he was one of the lead therapists" at CRLA.

Amanda J.'s mother was not the only witness who testified she had the impression that Bathum was a therapist or counselor. Ruah's mother also testified she had the impression Bathum was "[a] great family therapist" based on his sessions

with her and her family. Similarly, Hayley, Stephanie, Amanda J., Amy, and Erika B. testified they had the impression that Bathum was a therapist or counselor of some sort based on their interactions with him, the type of information he shared, and the manner in which he shared that information.

On this record, viewed in the light most favorable to the judgment, we conclude a rational trier of fact could find, beyond a reasonable doubt, Bathum represented himself to be a therapist or counselor at CRLA. Accordingly, substantial evidence supports the jury's finding he held himself out as a therapist or drug or alcohol abuse counselor under section 729, subdivision (a).

## IV. Whether Bathum's Convictions on Count 18 or 19 Must Be Reversed—or One of His Sentences on Those Counts Must be Stricken—Because They Were Based on a Single Incident

Bathum contends either count 18 or count 19, which were based on the encounter between Bathum and Amanda J. at the Four Seasons Hotel, must be reversed because acts committed in a "single sexual encounter can yield only a single conviction[ ]" for sexual exploitation. In support, he argues *People v. Harrison* (1989) 48 Cal.3d 321 (*Harrison*), where our Supreme Court held multiple acts of forcible penetration occurring in a single assault can give rise to multiple convictions under section 289 (*Harrison*, *supra*, at p. 334), is inapplicable because sexual exploitation "is not a violent crime." In the alternative, citing section 654, Bathum contends "only a single punishment may be imposed for

what amounted to an indivisible course of conduct with a single intent and objective."[8]

In response, the Attorney General contends both of Bathum's arguments may be deemed forfeited as conclusory. In addition, the Attorney General argues Bathum's arguments are meritless because they were rejected in *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*) and *People v. Bright* (1991) 227 Cal.App.3d 105, which was cited with approval in *Scott*.

At the outset, we note Bathum's primary argument is unsupported by citation to pertinent legal authority, and his alternative argument consists of a single, conclusory sentence in a footnote. Accordingly, both arguments have been forfeited. (*People v. Hardy* (1992) 2 Cal.4th 86, 150; *People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5.) In any event, as discussed below, we conclude the arguments are meritless.

### A. Convictions on Counts 18 and 19

Bathum primarily argues sexual acts committed in a single incident may give rise to only one conviction for sexual exploitation under Business and Professions Code section 729 because *Harrison* does not apply to non-violent sex crimes. In *Scott*, however, our Supreme Court applied *Harrison*'s principles to conclude a defendant who fondles a victim multiple times in a

---

8    For the first time in his reply brief, Bathum also argues that under the plain language of Business and Professions Code section 729, subdivision (b)(2), a defendant may sustain only one conviction and one sentence for committing multiple acts of sexual exploitation with a single victim. We need not address this contention because it was not raised in his opening brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) In any event, as discussed in section XI, we conclude it is meritless.

single incident may sustain multiple convictions under section 288. (*Scott*, *supra*, 9 Cal.4th at pp. 344-348.) That statute prohibits the commission of lewd and lascivious acts with a child under the age of 14, and does not require those acts to be accompanied by violence for purposes of conviction. (§ 288, subd. (a).) Similarly, Business and Professions Code section 729 prohibits sexual acts between a person who holds himself out as a psychotherapist or drug and alcohol abuse counselor with a patient, even where those acts are unaccompanied by violence. (Bus. & Prof. Code, § 729, subd. (a).) Under these circumstances, we conclude Bathum has not shown *Harrison* should not apply here, and reject his contention that a defendant who engages in multiple acts in violation Business and Professions Code section 729 during a single incident may sustain only one conviction under the statute.

### B.    Separate Sentences on Counts 18 and 19

At the time Bathum was sentenced, section 654, subdivision (a) provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "'applies when there is a course of conduct which violates more than one statute but constitutes an indivisible transaction.' [Citation.] Generally, whether a course of conduct is a divisible transaction depends on the intent and objective of the actor: 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*).)

40

"However, the rule is different in sex crime cases. Even where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished. [Citations.] [¶] But, section 654 does not apply to sexual misconduct that is 'preparatory' in the general sense that it is designed to sexually arouse the perpetrator or the victim. [Citation.]" (*Alvarez, supra*, 178 Cal.App.4th at p. 1006.)

As discussed above, Amanda J. testified that at the Four Seasons Hotel, Bathum first performed oral sex on her. Afterwards, he digitally penetrated her. Then, upon his request, Amanda performed oral sex on him. Her testimony establishes these activities were performed for purposes of accomplishing Bathum's sexual arousal. Nothing in her testimony indicates the earlier acts were "merely incidental to or facilitative of the later acts[,]" because each of those acts could have been accomplished independently (i.e., without being preceded by any of the other acts that took place). (*People v. Madera* (1991) 231 Cal.App.3d 845, 855; see also *People v. Bright, supra*, 227 Cal.App.3d at p. 110.) Thus, we conclude Bathum has not shown he should have only been sentenced to a single punishment on counts 18 and 19.

## V.    Sufficiency of Evidence – Whether Substances Furnished were Methamphetamine and Heroin

### A.    Governing Principles

To prove a defendant is guilty of furnishing a controlled substance under Health and Safety Code sections 11352 and/or 11379, the prosecution must prove: (1) the defendant furnished a controlled substance; (2) the defendant knew of its presence; and

(3) the defendant knew of the substance's nature or character as a controlled substance. (CALCRIM No. 2300.)

## B.      Analysis

Bathum contends each of his convictions for furnishing a controlled substance must be reversed because there was insufficient evidence demonstrating he had, in fact, provided the alleged recipients with methamphetamine and heroin. He argues "[t]he testimony established, at best, [he] provided substances that 'looked like' and 'acted like' meth/heroin. It did not establish [he] actually provided those drugs."

We begin our analysis by noting "the nature of a substance, like any other fact in a criminal case, may be proved by circumstantial evidence. [Citations.]" (*People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369.) To ascertain whether sufficient circumstantial evidence was presented in this case, *People v. Winston* (1956) 46 Cal.2d 151 (*Winston*) and *People v. Chrisman* (1967) 256 Cal.App.2d 425 (*Chrisman*), are instructive.

In *Winston*, the defendant was convicted of three counts of furnishing marijuana to a minor in violation of former Health and Safety Code section 11714, among other offenses. (*Winston*, *supra*, 46 Cal.2d at p. 153.) On appeal, he challenged his convictions on those counts by arguing there was insufficient evidence showing "the cigarettes [he had provided and] smoked by the two minor[s] . . . contained marijuana[.]" (*Id.* at p. 154.) While he "conced[ed] that the prosecution need not physically produce the narcotic, he insist[ed] that to prove a substance is a narcotic, there must not only be testimony of the user but also that of a medical doctor or expert. [Citations.]" (*Id.* at p. 155.)

The appellate court rejected the defendant's contention, reasoning "neither case [cited by the defendant held] that such

42

expert evidence is required for a conviction if the users demonstrate a knowledge of the narcotic as such." (*Winston, supra*, 46 Cal.2d at p. 155.) Subsequently, the appellate court observed: "Both [minors] testified that they had frequently smoked marijuana; they described the appearance of a marijuana cigarette, having tucked in ends; they related the custom of smoking such a cigarette in chain fashion in a group, each person taking one or two puffs and inhaling, then passing it to another; and they told of their 'high' feeling after about 15 minutes, their feeling of freedom from their cares, lasting about three to four hours, then their feeling of 'coming down,' that is, their feeling of depression, at which time they became hungry." (*Id.* at p. 156.) Relying largely on their testimony, the court "conclude[d] that the fact that the cigarettes smoked by the [minors] were marijuana cigarettes was amply proved." (*Id.* at p. 157.)

The defendant in *Chrisman* was convicted of two counts of furnishing heroin in violation of former Health and Safety Code section 11501, among other offenses. (*Chrisman, supra*, 256 Cal.App.2d at p. 428.) His convictions on those counts were largely based on the testimony of Joy Anne Osborne, the alleged recipient of the heroin. (See *id.* at pp. 430-431.)

Osborne testified she had been addicted to heroin for over three months as of September 1965, and she had met the defendant, who developed an addiction to heroin a month after she had started using, through other addicts. (*Chrisman, supra*, 256 Cal.App.2d at p. 430.) According to Osborne, the defendant purchased heroin in San Francisco, and they used it together. (*Id.* at p. 431.) She "described the place, the person from whom, and the manner in which the heroin was obtained[,]"as well the balloons in which it was packaged. (*Ibid.,* italics omitted) Osborne

testified she and the defendant would have an injection of heroin before returning to Santa Clara. (*Ibid.*) She described and identified the paraphernalia the defendant used for heating and injecting the heroin, as well as the manner in which it was used. (*Ibid.*) After deciding she "wanted to kick the habit[,]" Osborne checked into a hospital and experienced withdrawal symptoms. (*Ibid.*)

On appeal, the defendant argued his convictions on the furnishing counts were supported by insufficient evidence "because there was no evidence that the substance supplied by him to the alleged recipient was in fact a narcotic[.]" (*Chrisman*, *supra*, 256 Cal.App.2d at p. 428.) He contended "the testimony of a user alone, without expert testimony, can never be sufficient to identify the nature of the substance." (*Id.* at p. 432.)

Relying principally on *Winston*, *supra*, 46 Cal.2d at pp. 155-156, the appellate court rejected the defendant's argument. (*Chrisman*, *supra*, 256 Cal.App.2d at pp. 432-433.) Subsequently, it held Osborne's testimony, along with testimony showing the defendant was addicted to heroin and that paraphernalia found in his car had traces of heroin, was sufficient to establish the substance the defendant had given her was heroin. (*Id.* at p. 434.)

Applying *Winston* and *Chrisman* here, along with the deferential standard of review governing the sufficiency of the evidence underlying a criminal conviction, we conclude the record contains substantial evidence to support the jury's finding that, beyond a reasonable doubt, Bathum furnished methamphetamine and heroin to the persons alleged.

Bathum was convicted of furnishing methamphetamine to nine former CRLA clients: Stephanie J., Dana R., Brittni J., Amanda S., Mollie W., Jennifer I., Erika B., Ruah A., and Amy

W. With the exception of Brittni and Ruah, all of these former clients testified they were familiar with the drug, and had previously seen or used it on multiple occasions. Indeed, Dana, Erika, Amy, and Mollie were addicted to methamphetamine when they checked into CRLA. Amy and Mollie used methamphetamine daily before checking into CRLA.

Brittni testified she had not seen methamphetamine prior to the incident at the Anza Hotel, which was the first time she ever smoked it. At the time, either Bathum or Amanda told her that the drug he had brought was methamphetamine. After that incident, she ingested methamphetamine ten more times.

All of the witnesses above testified to the appearance of the methamphetamine given to them by Bathum. They described the substance as rocky, crystal, and/or glassy shards, which were either clear, off-white, or cloudy in color. Those who had prior experience with methamphetamine testified the appearance of the methamphetamine from Bathum was consistent with their past observations of methamphetamine. Similarly, Brittni and Ruah testified the appearance of the methamphetamine initially provided by Bathum was consistent with their subsequent observations of methamphetamine.

As discussed in the Background section above, all nine of these witnesses described in detail how the methamphetamine was packaged or presented, how they used it, and how Bathum ingested it with them. The seven witnesses who had previous experience with methamphetamine testified they experienced a distinctive high upon ingesting methamphetamine in the past, and that the feelings and sensations they felt when ingesting the methamphetamine provided by Bathum was consistent with their prior experiences. Similarly, Brittni and Ruah testified they felt a

distinctive high after using methamphetamine for the first time with Bathum, and they got the same high when using methamphetamine on subsequent occasions.

Dana testified Bathum gave her and another former client crystal methamphetamine while in Joshua Tree. After purchasing syringes at a drug store, the three of them injected themselves with the methamphetamine while in Bathum's car. The next morning, Dana tested positive for methamphetamine on a urine test.

Bathum was convicted of furnishing heroin to Brittni J., Brittney D., and Amy W. All three of them were addicted to heroin and using it daily before checking into CRLA.

Brittni and Brittney identified the heroin provided by Bathum as "black tar heroin." All three witnesses described his heroin as a gooey, sticky, black or dark brown substance, which smelled like vinegar. While Brittni's first experience with black tar heroin was with Bathum at the Four Seasons Hotel, Brittney and Amy testified they had seen black tar heroin in the past, and the heroin Bathum provided had the same smell, texture, and appearance as the heroin they saw before. Brittni testified the heroin she later saw at the Malibu Riviera Motel had the same appearance, texture, and smell as the heroin at the Four Seasons Hotel.

Brittney and Amy testified that when they used the heroin provided by Bathum, they experienced the same high they felt when using heroin in the past. Brittni testified that when she used black tar heroin for the first time at the Four Seasons Hotel, she felt a similar but more extreme version of the high she experienced when using a different form of heroin in the past.

She felt the same type of high when she used black tar heroin at the Malibu Riveria Hotel.

The testimony of these CRLA clients was supported by the testimony of Deputy Sheriff Anthony Meyers and Criminalist Aaron Lewis concerning substances recovered from Bathum's vehicle in June 2016. Deputy Meyers testified that on June 28, 2016, he observed a vehicle pulled over in an area alongside a road commonly used for narcotics activity. When he pulled over behind the vehicle and approached it on the driver's side, he saw Bathum holding a glass pipe used for smoking narcotics in his hand. As Deputy Meyers got closer, Bathum saw him and quickly reached his hands under the seat.

At that point, Deputy Meyers directed Bathum to exit the vehicle, detained him, and searched him. From Bathum's jacket pocket, Deputy Meyers retrieved two plastic bags. One bag contained a crystalline substance he recognized as methamphetamine. Inside the car, he found a small brown bag containing heroin and additional narcotic paraphernalia commonly used to ingest heroin, among other drugs. Under the seat on the floor, he found a warm glass methamphetamine pipe with a burnt, crystalline substance inside. He booked all the items above into evidence.

Criminalist Aaron Lewis examined items booked into evidence by Detective Meyers. After conducting various tests on those items, Lewis confirmed: (1) the crystalline substance in the plastic bag from Bathum's jacket contained methamphetamine; and (2) one of the other substances Detective Meyers found contained heroin.

In sum, viewing the evidence above in the light most favorable to the judgment, we conclude a rational trier of fact

could find, beyond a reasonable doubt, the substances furnished by Bathum were, in fact, methamphetamine and heroin. (See *Winston*, *supra*, 46 Cal.2d at pp. 156-157; see also *Chrisman*, *supra*, 256 Cal.App.2d at p. 434.) Accordingly, we reject Bathum's challenge to the sufficiency of the evidence underlying his convictions for furnishing controlled substances.

## VI. Whether the Trial Court Erred by Denying Bathum's Post-Trial Motions for Relief based on the Prosecution's Failure to Disclose the Hayley G. Video

### A. Relevant Background

On February 26, 2019, a year after the verdicts were read in this case, Bathum "move[d] for an order dismissing all the charges/vacating the judgment in this action because of outrageous government conduct . . . . In the alternative, [Bathum] request[ed] a new trial on all counts on which [he] was convicted." Bathum argued he was entitled to the relief sought because the prosecution intentionally suppressed evidence favorable to him prior to trial, in violation of its obligations under *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (*Brady*).

The evidence at issue is a 14-second video clip of Hayley G. recorded by Cliff Brodsky, Bathum's former business associate, at a law firm in January 2015.[9] The video begins with Brodsky and

---

9      A copy of the video was not included in the record on appeal. In his opening brief, however, Bathum states the video is on Youtube and provided the address of the website where it may be viewed. The Attorney General agrees the video is available at the address provided. Under these circumstances, on our own

48

Hayley next to one another. Brodsky says, "I'm here with Hayley." Hayley smiles briefly and says "Hello." Brodsky then states, "Now Hayley was a client over at Chris Bathum's place[,]" and asks her if she would "mind saying on camera that [she was] drugged and raped." In response, Hayley makes the following statement with what appears to be a slight smile: "I was drugged and raped by Chris Bathum." (<https://www.youtube.com/watch?v=2YLQW2bNc0Y> [as of Oct. 13, 2022].) According to Bathum's motion, defense counsel first became aware of the video in July 2018.

In opposition, the prosecution contended Bathum was not entitled to the relief sought. Among other things, the prosecution argued "there was no *Brady* violation because it is not reasonably probable that the jury would have acquitted [Bathum] had [the video] been considered at trial."

The trial court held a hearing on Bathum's motion over the course of several days. Relevant portions of the witness testimony presented at the hearing are summarized below.

Brodsky testified he recorded the video on January 12, 2015, when he brought Hayley with him to a law firm. She had told him shortly beforehand that Bathum drugged and raped her. Thus, while they were sitting in the law firm and "killing time," Brodsky "'said, 'Hey, remember that thing you just told me, tell the world what you just told me a second ago, that you were

---

motion, we hereby take judicial notice of the video available at the link Bathum has provided. (Evid. Code, § 452, subd. (h); see also *Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 37, fn. 2 [taking judicial notice under Evidence Code section 452 sua sponte].)

drugged and raped by Chris Bathum' to remind her what she just said . . . ."

Brodsky testified that on July 20, 2016, he attended a meeting with Detective Jeffrey Jackson and Deputy District Attorney (DDA) Shaun Gipson. He brought with him a box "full of thousands of pages of stuff and a . . . bag full of stuff." He also brought his laptop containing the Hayley G. video and other digital media he wanted to share, as well as a thumb drive containing copies of the digital media. Brodsky testified some of these materials related to Bathum's involvement in sex crimes, and some related to his involvement in fraud crimes.[10]

Brodsky testified that during the meeting, he played videos of a woman named Rebecca M. detailing her allegations against Bathum. He then tried to show the Hayley G. video on his computer, but it did not work. Subsequently, he posted the video on social media.

DDA Gipson testified he was assigned to the fraud case relating to Community Recovery, and attended a meeting with Brodsky in July 2016. Detective Christopher Luistro from the California Department of Insurance was also present, along with

---

10    In addition to the case underlying this appeal, in Los Angeles Superior Court Case No. BA451664, Bathum was charged with numerous violations of section 550, subdivision (a)(1) [insurance fraud committed by fraudulent claim], section 487, subdivision (a) [grand theft], section 530.5, subdivision (c)(3) [fraudulent possession of personal identifying information], and section 186.10, subdivision (a) [money laundering]. Those charges arose out of his alleged involvement in a $176 million fraud scheme. Pursuant to a plea agreement entered in that case, the trial court sentenced him to 20 years of imprisonment, to be served concurrently with his sentence in the present case.

Detectives Jackson and Denise Escobedo-Fuchs from the Los Angeles Sheriff's Department. The purpose of the meeting was to gain information regarding the cases of fraud and sexual assault involving Community Recovery.

DDA Gipson testified he did not view the Hayley G. video at the meeting. He recalled Brodsky played a video of a woman named Rebecca M. claiming she had been assaulted at Community Recovery. Brodsky tried to play another video, but was unable to do so due to technical difficulties.

DDA Gipson testified Brodsky turned over a red flash drive, as well as a box containing a binder, a brown wallet, and a lot of papers at the meeting. Brodsky represented to DDA Gipson that everything he had was related to the insurance fraud case against Bathum. Consequently, Detective Luistro took the box and the flash drive. The box was not returned to the district attorney's office until the latter half of 2018.

DDA Gipson testified he did not learn of the Hayley G. video until August 2018, after talking to Detective Jackson about it and receiving a copy from his supervisor. Subsequently, he spoke with Detective Luistro's supervisor, Sergeant Jeff Gomez. Sergeant Gomez told DDA Gipson he had received a flash drive from Detective Luistro. Sergeant Gomez then returned the flash drive to DDA Gipson, who believed it to be the flash drive previously included amongst Brodsky's materials. The Hayley G. video was on the flash drive, among many other files.

Detective Jackson testified he had reached out to Brodsky before the July 20, 2016 meeting at DDA Gipson's recommendation. Brodsky told Detective Jackson he had a video of Hayley claiming she had been raped by Bathum, and that he wanted to show it to him.

According to Detective Jackson, Brodsky brought a box containing numerous documents to the meeting. Brodsky indicated to him all of the documents related to the insurance fraud case against Bathum, which DDA Gipson and Detective Luistro were working on. Detective Jackson did not recall Brodsky taking any thumb drives out of the box. He did, however, testify that there was a flash drive in Brodsky's laptop, which Brodsky eventually put on the center of the table. Although Brodsky showed a brief video of Rebecca M. during the meeting, he did not show the Hayley G. video, as he could not find it on his laptop. Detective Luistro took the box and all of its contents, save for a few documents kept by Detective Jackson. Sometime after the meeting, Detective Jackson saw the Hayley G. video on social media.

Detective Escobedo-Fuchs testified she attended a meeting with Brodsky on July 20, 2016. She did not recall Brodsky showing her any videos during the meeting, although Brodsky did "attempt[ ] to look for something on . . . a laptop computer, but was frustrated."

In ruling on Bathum's motions, the trial court first observed "the defense has raised . . . three different motions . . . . There's a motion to dismiss for outrageous government conduct. There's a *Brady* violation motion, and then there's a motion for a new trial based upon newly-discovered evidence." The trial court then noted the motions were "all based upon the same set of facts[ ]" (i.e., the suppression of the Hayley G. video).

Subsequently, the trial court acknowledged defense counsel's point that Hayley's demeanor in the video, where she was smiling, differed from her demeanor at trial, where she

presented herself as "somewhat pitiful[,]" as she was "crying[ ] and . . . appeared to be traumatized[.]" The court determined, however, the differences in her demeanor only provided slight impeachment value. In so doing, it noted Hayley testified in court for three days, and was subject to "a grueling, difficult cross-examination[ ]" by defense counsel. Specifically, the trial court observed defense counsel was given "great leeway in questioning" Hayley, as he was allowed to question her on "all sorts of matters[,]" including her lifestyle choices, her drug usage, and her attempt to extort money from defense counsel and Bathum by contacting defense counsel and asking for money to lie on the stand. Under those circumstances, the trial court found the brief video, in which Hayley made an inculpatory statement consistent with her testimony, would not have led the jury to discredit her.

Accordingly, the trial court found the Hayley G. video was not material and would not have resulted in a different outcome had it been presented to the jurors at trial. It therefore denied Bathum's post-trial motions to dismiss and for a new trial.

## B. Motions for Relief Based on Alleged *Brady* Violation and Newly-Discovered Evidence

### 1. Governing Principles and Standards of Review

#### a. *Brady* violations

"Although the term '*Brady* violation' is often broadly used to refer to any failure on the part of the prosecution to disclose favorable information to the defense, a true violation occurs only if three components coexist: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been

53

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1474 (*Uribe*), citing *Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [119 S.Ct. 1936, 144 L.Ed.2d 286] and *Banks v. Dretke* (2004) 540 U.S. 668, 691 [124 S.Ct. 1256, 157 L.Ed.2d 1166].)

"Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) To do so, a defendant must "'show[ ] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.]" (*Uribe, supra*, 162 Cal.App.4th at p. 1473, quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 435 [115 S.Ct. 1555, 131 L.Ed.2d 490].)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence. [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

### b.    Motion for New Trial Based on Discovery of New Evidence

"A defendant may seek a new trial '[w]hen new evidence is discovered material to the defendant, and which he could not,

with reasonable diligence, have discovered and produced at the trial. . . .' [Citation.] 'The standard of review of an order denying a motion for a new trial based on newly discovered evidence was established . . . in 1887: "To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulatively merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at trial; and 5. That these facts be shown by the best evidence of which the case admits.' . . . [¶] 'Applications on this ground are addressed to the discretion of the court below, and the action of the court below will not be disturbed except for an abuse of discretion . . . .'" [Citations.]' [Citation.] "'In determining whether there has been a proper exercise of discretion on such [a] motion, each case must be judged from its own factual background. [Citation.]" [Citation.]' [Citation.]" (*People v. Cua* (2011) 191 Cal.App.4th 582, 608.)

### 2.    Analysis

Bathum contends his motion for post-trial relief based on the alleged *Brady* violation should have been granted because the three-part test set forth in section VI.B.1.a above has been satisfied. He argues: (1) "[t]he video revealed Hayley's true self – not the weeping victim, but the smirking, 'I'm going to get money from you,' self-interested Bathum-Slayer[,]" and therefore could have "impeached [her] to a greater degree[ ]"; (2) the video was suppressed because the police received it but the prosecution did not disclose it to him; and (3) he was prejudiced because "[t]he government's case absolutely and exclusively hinged on Hayley's testimony for the six most serious counts[,]" and at least one juror

55

could have rejected her testimony after evaluating her credibility based on her demeanor in the video.

The parties do not seem to dispute the first and second elements of the applicable three-part test have been satisfied. We note the Attorney General asserts the video was inculpatory, and that the prosecution's failure to disclose it to defense counsel was accidental. The Attorney General does not, however, appear to dispute the video could have been used to impeach Hayley, or that it was suppressed in this case.

Resolution of the *Brady* issue therefore turns on whether Bathum has shown the third element has been satisfied, i.e., whether the video "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.]" (*Uribe, supra*, 162 Cal.App.4th at p. 1473.) On the record before us, we conclude he has not.

As noted above, *Brady* requires the prosecution to disclose "evidence reflecting on the credibility of a material witness. [Citations.]" (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1380.) However, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material. [Citations.]" (*United States v. Avellino* (2d Cir. 1998) 136 F.3d 249, 257; see also *Tankleff v. Senkowski* (2d Cir. 1998) 135 F.3d 235, 251 ["When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim. [Citations.]"].)

Applying these principles, we conclude there was no reasonable probability the video would have led to a different result at trial. As the trial court correctly observed, the video is only 14 seconds long, and Hayley's inculpatory statement therein is wholly consistent with her testimony at trial, where she testified Bathum gave her Xanax prior to raping her at Adams House. The record reflects Hayley was extensively cross-examined by defense counsel. In addition to minutely scrutinizing her testimony from her direct examination, defense counsel questioned her on a variety of topics, including: (1) her illegal attempt to extort money from Bathum by contacting defense counsel and asking him to relay to Bathum that, if he paid her money, she would not testify against him; (2) her continuation of her relationship with Bathum even after he had engaged in the alleged sexual acts with her; (3) her receipt of gifts, such as a new car, privileges, money, and special treatment from Bathum while at CRLA; (4) her delay in reporting the alleged crimes to Detective Jackson; and (5) discrepancies between her trial testimony and her preliminary hearing testimony. Further, defense counsel sought to discredit Hayley based on differences in her demeanor at trial and her demeanor in a prior interaction. He noted that on direct examination, he "notice[d] . . . [she was] overcome by emotion several times[.]" Immediately thereafter, defense counsel pointed out that when she was on the phone with him seeking payment in exchange for her silence at trial, she was not crying.

Despite defense counsel's rigorous attacks on Hayley's credibility, the jury still believed her testimony regarding the incidents underlying counts 1 through 6 and 9. On this record, we are not convinced the video would have swayed the jury to

57

discredit her testimony and acquit him on any of those counts. Thus, Bathum has not shown his convictions should be reversed based on the alleged *Brady* violation, as he has not "'show[n] a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar, supra*, 35 Cal.4th at p. 1043.) For the same reasons, he has not shown the trial court abused its discretion by denying his motion for a new trial based on newly-discovered evidence. (*People v. Cua, supra*, 191 Cal.App.4th at p. 608.)

## C. Motion to Dismiss Based on Outrageous Government Conduct

### 1. Governing Principles and Standard of Review

Federal and California courts have "recognized the possibility government conduct could be so outrageous that due process would bar the government from seeking a conviction. [Citations.]" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1005 (*Guillen*); see also *id.* at pp. 1002-1006 [summarizing federal and California authorities].) "Where defendant's right to counsel is not implicated, however, dismissal for outrageous government conduct is warranted only where the conduct impairs a defendant's constitutional right to a fair retrial. [Citations.]" (*People v. Fultz* (2021) 69 Cal.App.5th 395, 432.)

"'The determination of whether the government engaged in outrageous conduct in violation of the defendant's due process rights is a mixed question. The first step involves the consideration and weighing of the evidence and assessing the credibility of the witnesses to determine factually whether, and to what extent, governmental misconduct occurred. This factual determination is clearly one that is subject to a deferential

58

standard of review. But the second step—whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating the defendant's due process rights—involves the application of law to the established facts and is primarily a legal question. . . . ' [Citations.]" (*Guillen*, *supra*, 227 Cal.App.4th at pp. 1006-1007.)

### 2. Analysis

Bathum contends his convictions must be reversed because the investigating government officials engaged in outrageous conduct by knowingly and intentionally keeping the Hayley G. video from defense counsel. The Attorney General responds: "His claim is meritless since the record abundantly supports the trial court's conclusion that the video had trivial impeachment value at most, and the failure to provide it to the defense was simply an understandable accident."

We agree with the Attorney General. As discussed in section VI.A above, the testimony at the hearing on Bathum's post-trial motions for relief shows: (1) the government officials investigating the fraud case against Bathum were different from those simultaneously investigating the sex crimes case against him; (2) Brodsky did not play the Hayley G. video at the July 2016 meeting; (3) Brodsky turned over a box of materials and a flash drive containing a copy of the video at the meeting; (4) except for a few documents kept by Detective Jackson, Detective Luistro from the California Department of Insurance took the box and the flash drive based on Brodsky's representation that his materials largely related to alleged insurance fraud; (5) Detective Luistro had the flash drive and did not return it until sometime after August 2018; (6) although Brodsky told Detective Jackson about the video prior to the July

2016 meeting, Detective Jackson did not view it until he found it on social media, after the meeting took place; and (7) DDA Gipson was unaware of the video and did not see it until August 2018. This evidence adequately shows the prosecution's failure to disclose the video to defense counsel prior to trial was inadvertent and was not—as Bathum contends—the product of a malicious conspiracy by government officials.

Accordingly, the record contains substantial evidence demonstrating no outrageous government conduct occurred in this case. (See *Guillen*, *supra*, 227 Cal.App.4th at p. 1006.) We therefore conclude the trial court correctly denied Bathum's motion to dismiss based on outrageous government conduct.

## VII. Instructional Error – Omission of Unanimity Instruction on Furnishing Counts

### A. Governing Principles

"Defendants in criminal cases have a constitutional right to a unanimous jury verdict. [Citation.] From this constitutional principle, courts have derived the requirement that if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' [Citations.]" (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114, italics in original.) "The prosecution can make each election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument [Citations.] Such an

election removes the need for a unanimity instruction. [Citation.]" (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.)

### B.     Analysis

Bathum contends he was "deprived of his constitutional right to a unanimous jury verdict[ ]" because "[t]he prosecutor adduced evidence of multiple discreet [sic] acts of furnishing [drugs] by [Bathum], occurring at different places and at different times," but "did not elect which act was the basis for each individual charge[ ]" and "[t]he trial court did not instruct on unanimity." Accordingly, he argues "[r]eversal is required [o]n [c]ounts 15, 24, 25, 26, 28, 31, 43, and 48." In the heading on this issue, he also asserts defense counsel was ineffective by failing to request a unanimity instruction.

Bathum's arguments are without merit. The record reflects that during closing argument, the prosecution methodically identified the specific act underlying each and every count charging Bathum with furnishing a controlled substance. In so doing, the prosecution even specified some acts of furnishing occurred outside of Los Angeles County, and did not form the basis of the charges.

Accordingly, the trial court was not required to issue a unanimity instruction. We therefore reject Bathum's claim of instructional error. (See *People v. Mayer* (2003) 108 Cal.App.4th 403, 418 [no unanimity instruction required where prosecution set forth factual basis of the charges in opening statement].) For the same reasons, we conclude Bathum has not shown defense counsel's failure to request a unanimity instruction constituted deficient performance resulting in prejudice, and likewise reject his perfunctory assertion of ineffective assistance of counsel. (See

61

*People v. Terrell* (1999) 69 Cal.App.4th 1246, 1252 [setting forth defendant's burden of proving ineffective assistance of counsel].)

## VIII. Ineffective Assistance of Counsel – Concession that Bathum Held Himself out as a Psychotherapist and/or Drug/Alcohol Abuse Counselor

### A.     Relevant Background

Prior to trial, defense counsel successfully moved to exclude the portion of a book written by Bathum in which he referenced his work as a therapist. In arguing the evidence would be "fairly cumulative[,]" defense counsel stated: "Virtually every woman that testified at the preliminary hearing testified . . . Bathum ran group counseling[ ] [and] did individual counseling. I don't think there's any question that . . . Bathum held himself out as a therapist. I don't think that is really going to be much of an issue at trial. [¶] The issue might be, you know, whether a certain person was a client at the time a sexual exploitation act occurred. That might be an issue. But with respect to whether he was a therapist or held himself out as a therapist for purposes of the sexual exploitation counts, there is hardly an argument about that." Later, he reiterated: "[W]ith respect to whether [Bathum] was a therapist or not or he held himself out as such, I don't know how much of an argument there really is on that, and the evidence on that is legion so the defense isn't planting a flag on that."

During closing argument, while going over the elements of sexual exploitation under Business and Professions Code section 729, defense counsel stated: "First of all, number one, 'the defendant held himself out to be a drug abuse counselor.' You know, I'm not going to stake my flag on trying to say he wasn't

holding himself out as [a] drug abuse counselor. The evidence is what it is. Okay?"

## B.     Governing Principles

"'The burden of proving ineffective assistance of counsel is on the defendant.' [Citation.]" (*People v. Terrell, supra*, 69 Cal.App.4th at p. 1252.) "To establish constitutionally inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1057-1058.) "A defense counsel is not required to make futile motions or to indulge in idle acts to appear competent. [Citations.]" (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091-1092.) "Reversal of convictions on the ground of inadequate counsel is mandated only if the record affirmatively reveals no rational tactical purpose for his or her act or omission. [Citations.]" (*People v. Terrell, supra*, 69 Cal.App.4th at p. 1253.)

## B.     Analysis

Bathum contends defense counsel was ineffective by conceding he held himself out as a therapist within the meaning of Business and Professions Code section 729. In support of his position, he asserts: (1) the evidence did not show he held himself out as a therapist or counselor; (2) defense counsel cross-examined Wood, a former CRLA therapist, about whether Bathum "profess[ed] he was a therapist"; and (3) in closing

63

argument, defense counsel asked the jury the question whether Bathum had held himself out as a therapist or counselor.

Bathum's argument is unavailing for two reasons. First, as the Attorney General observes, the record indicates defense counsel's concession was a reasonable tactical decision, and did not constitute deficient performance. On this point, the record reflects that prior to trial, defense counsel was well aware numerous witnesses were going to testify to facts showing Bathum held himself out as a therapist or drug and alcohol abuse counselor. With that in mind, he successfully moved to exclude a portion of Bathum's book.

Moreover, as defense counsel correctly predicted, the prosecution presented a wealth of evidence at trial showing Bathum held himself out as a therapist or counselor at CRLA. (Section III.F, *ante*.) We agree with the Attorney General that, by acknowledging that evidence in closing argument and stating he was not going to "stake [his] flag" on disputing that element, it appears defense counsel was reasonably attempting to maintain credibility with the jury in order to raise other defenses to the charges. (See *People v. Gurule* (2002) 28 Cal.4th 557, 597 ["Counsel may have concluded that honesty and candor with the jurors was necessary so as not to lose credibility with them"].) For these reasons, we conclude Bathum has not shown counsel's performance was deficient based on the concession at issue. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1254 [rejecting claim for ineffective assistance of counsel where record reflected defense counsel's failure to call a witness at trial rested on "several sound tactical grounds[ ]"].)

In addition, Bathum cannot show defense counsel's concession resulted in prejudice. As discussed above, the

prosecution adduced testimony from multiple witnesses, including several former CRLA clients and their family members, as well as a former CRLA therapist, demonstrating Bathum held himself out as a therapist or counselor. (Section III.F, *ante*.) On this record, we conclude that even if counsel had argued the prosecution failed to carry its burden on that element, there is no reasonable probability the result would have been more favorable to Bathum. (See *People v. Mitcham*, *supra*, 1 Cal.4th at p. 1058.)

## IX.   Ineffective Assistance of Counsel – Failure to Challenge Deputy Meyers' Testimony Regarding Nature of Substances Recovered from Bathum's Car

As discussed in section V.B above, Deputy Meyers testified: (1) he came upon Bathum's car parked alongside a road known for drug activity in June 2016; (2) he detained Bathum and conducted a search for narcotics after seeing Bathum holding a glass pipe; (3) in Bathum's jacket, he found a plastic bag containing a crystalline substance he recognized to be methamphetamine; and (4) in Bathum's car, he found a brown paper bag containing heroin and other drug paraphernalia.

Bathum contends defense counsel's performance was deficient because he failed to challenge Deputy Meyers' testimony regarding the nature of the substances recovered from Bathum's vehicle. Noting the prosecution "did not seek to ascertain Meyer's [sic] history with identifying drugs, his training, his study, his prior experience[,] or how he made his determinations[,]" Bathum asserts Deputy Meyers' testimony was nothing more than "unsupported conclusions about the true nature of the narcotics" he found.

Bathum's argument is without merit. As discussed above, and as Bathum concedes in his reply brief, Criminalist Lewis

tested the substances found by Deputy Meyers and confirmed they contained methamphetamine and heroin. (Section V.B, *ante*.) On this record, we conclude Bathum cannot demonstrate deficient performance or prejudice based on defense counsel's failure to object to Deputy Meyers' testimony.

## X. Admission of Testimony Regarding Several Witnesses' Feelings about their Experiences

### A. Relevant Background

Bathum takes issue with several incidents at trial where the prosecution asked Hayley G., Amanda J., Stephanie J., and Ruah D. about how they felt during or after certain experiences. We summarize those portions of the record here.

#### 1. Hayley G.

Within a week of the alleged sexual assault at Adams House, Hayley told Josh Geiger, her case manager, that Bathum "had been inappropriate with [her]." Soon thereafter, she was called into a meeting in Bathum's office, where both Geiger and Bathum were present. During the meeting, Geiger told Bathum what Hayley had shared with him. In response, Bathum "laughed it off and told [Hayley] that [they] could go ahead and have fun with it and make it . . . a rumor." He also told Hayley "to . . . pretty much forget about . . . what happen[ed] between [them]" and that "he could make this . . . disappear and go away."

Referring to Bathum's statements, the prosecution asked Hayley, without objection by defense counsel: "And how did you feel about that?" She testified: "Um, that I couldn't take this anywhere else, like I . . . had to shut up, and I . . . couldn't talk. I shouldn't open my mouth anymore." The prosecution

subsequently asked, again without any objection: "How did you feel about CRLA at that time?" Hayley testified she felt "defeated[,]" as she felt Geiger had "stabb[ed] [her] in the back[,]" and that she felt "cornered."

After Hayley related the details of the Summer Hill incident, the prosecution asked, without any objection: "Hayley, how did you feel . . . at that point about what just happened to you in that room?" She responded: "Um, I . . . didn't want to talk to anybody. I didn't want to be there."

At the close of her direct examination, the prosecution asked: "Hayley, as you are sitting here today . . . is there any one thing that stands out most in your mind about what happened to you with [the] defendant?" Over defense counsel's objections based on vagueness and relevance, Hayley testified: "My trust was broken. . . . . I haven't really trusted anybody since."

Lastly, on redirect examination, the prosecution asked: "Can you tell us why it is that you are sitting here testifying today? Why are you here?" Without any objection, Hayley responded she "didn't want other girls who were trying to get treatment and had trauma from their past to go through what [she] went through." As she explained what she meant, defense counsel objected to her testimony as constituting an improper narrative, which the trial court overruled. Hayley concluded: "I had a lot of doors slammed in my face for a long time. You know, I didn't trust [Detective] Jackson at first. He called me a lot, and I didn't trust him, but I just wanted this to stop happening."

## 2.    Amanda J.

After Amanda J. testified about the Four Seasons Hotel incident, the prosecution asked, without objection by defense counsel: "Can you . . . reach inside yourself and tell us what it is

67

that you were feeling at that point? Emotionally, physically, what were you feeling?" Amanda responded: "Scared, humiliated, disgusting, surreal, almost like it wasn't even real, shocked, really vulnerable and – really vulnerable."

Following the incident, Amanda told her mother what happened. Shortly thereafter, she contacted Amy W., her case manager, and "came up with a plan to get [her] exited[ ]" from CRLA. Amy agreed to tell Bathum and another staff member that Amanda "was talking negatively about Bathum to other clients." Amy did so, and Amanda was exited from CRLA the next day. She was about a week shy of completing a 90-day treatment program.

At that point, the prosecution asked: "How did you feel then about the fact that you are now making this plan and ultimately getting exited and not finishing that 90[-]day[ ] [program]?" Defense counsel objected to the question based on relevance, which the trial court overruled. Amanda stated: "I felt good about it because at the time what happened was so disgusting that I had to get out of there, and . . . I knew there were other options for me to continue care."

### 3.    Stephanie J.

Stephanie J. and Jennifer I. were exited from CRLA the day after they did drugs and had sex with Bathum at the W Hotel. Two days later, Bathum got them a room at the Good Nite Inn. Between the W Hotel incident and their stay at the Good Nite Inn, Stephanie and Jennifer used heroin they had purchased with money provided by Bathum. They stayed at the Good Nite Inn for nine or ten days. Stephanie testified Bathum came to their room "almost daily[ ]" and had sex with her four or five times.

68

The prosecution asked: "How did you feel about what was going on [during] those nine or ten days you are at the Good Nite Inn?" Over defense counsel's objection based on relevance, she answered: "I'd overdosed after being there for a couple days, using really heavy all of the time. I was just completely devastated. . . . [A]ny little . . . glimmer of hope I had remaining was gone." When asked "[w]hat was driving [her] to be doing what [she was] doing[,]" Stephanie answered: "Guilt and shame and just I couldn't believe that I had taken this time away from my kids and my family in Ohio and come out [to CRLA] and just how incredibly insane the whole story is. . . . I was just really disappointed and, kind of, lost faith in humanity . . . ."

After their stay at the Good Nite Inn, Jennifer and Stephanie returned to Ohio. Less than a month later, however, Stephanie returned to CRLA at Bathum's request. Soon after completing detoxification, the incident where she gave Bathum oral sex at Summer Hill occurred. After she described the incident, the prosecution asked, without any objection: "How do you feel, then, about what happened to you in this closet just a week after you got back [from Ohio]?" She answered: "I just felt so naive and stupid. Like, . . . I knew that bad things had happened to me [at CRLA] before, and I felt lack of options, so I just decided to do this, but I immediately regretted it."

At the close of her testimony on further redirect examination, the prosecution asked Stephanie: "As you are sitting here today, . . . is there any one particular thing that stands out most in your mind with regard to what had transpired with your experience with CRLA and [the] defendant?" Without any objection, she responded: "It was just a horrible experience from beginning to end."

69

### 4.  Ruah A.

Two months after the incident where Ruah and Bathum snorted methamphetamine in his office, she moved into his home and lived with him full-time for about five months. During her stay, Bathum gave her various drugs to ingest either daily or every other day, including crack and heroin.

At the end of her direct examination, the prosecution asked: "What is the one thing that stands out to you the most about the drugs that were furnished to you by [Bathum] at CRLA?" Without any objection, she answered: "It, pretty much, ruined my life. There is nothing more than that I can say. And he did a number on my brainwork . . . ."

## B.  Governing Principles

### 1.  Evidentiary Principles

Pursuant to Evidence Code section 210: "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Even relevant evidence, however, may be excluded under Evidence Code section 352, which states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In addition, Evidence Code section 780 provides, in relevant part: "Except as otherwise provided by statute, the . . . jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the

truthfulness of his testimony at the hearing[.]" Further, "a trial court has discretion, within the strictures of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility even on direct examination, so long as the prosecution reasonably expects the defense to attack the witness's credibility during cross-examination. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 86.)

## 2. Prosecutorial Misconduct

"'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.)

## C. Analysis

Bathum contends the prosecution's questions above and the witness's responses thereto were irrelevant and "unduly prejudicial, evoking an emotional bias against [him]." Therefore, he seems to argue that the trial court prejudicially erred by failing to exclude the testimony under Evidence Code section 352, that the prosecution engaged in misconduct by eliciting the testimony, and that defense counsel was ineffective by failing to object to all of the questions and testimony.

As an initial matter, we note defense counsel did not raise any objections under Evidence Code section 352, and therefore

71

any contention of error based on the trial court's failure to exclude the evidence under that statute has been forfeited. (*People v. Williams* (1997) 16 Cal.4th 153, 206.) Likewise, Bathum forfeited his contention of prosecutorial misconduct, as counsel did not object to any of the prosecutor's questions on that basis. (*People v. Silveria and Travis, supra,* 10 Cal.5th at p. 306.) In any event, as discussed below, we conclude that even if counsel had made timely objections on those grounds at trial, Bathum's contentions are meritless.

During his opening statement, defense counsel indicated he intended to pursue several strategies as part of Bathum's defense. With respect to the charges relating to forcible sexual acts, counsel asserted the evidence would show the victims consented to the underlying acts. Counsel also stated the evidence would show that, rather than preying upon the former CRLA clients who were going to testify, Bathum was the actual victim in this case. Specifically, he stated the evidence would show that once the alleged victims learned Bathum was addicted to drugs, they sought him out, seduced him, and manipulated him to get drugs and money from him. To accomplish these objectives, defense counsel indicated he intended to undermine the witnesses' credibility by questioning them on their financial motivations, their attempts to extort money from Bathum, when and how they reported the alleged crimes to authorities, and their imperfect recollection of the details surrounding the relevant events. Given these comments, the prosecution was entitled to ask the witnesses about their feelings regarding their experiences at CRLA to preemptively counter the defense's effort to present Bathum as the victim of their nefarious objectives. (See *People v. Merriman, supra,* 60 Cal.4th at p. 86 [prosecution

72

was "entitled to present evidence of the witnesses' reluctance to testify to preemptively counter" defense's challenges to their credibility].)

The witnesses' responses to the prosecution's questions were relevant to several key issues at trial. Hayley's feelings of being betrayed by Geiger when he shared with Bathum her disclosure of inappropriate conduct, as well as the deep feelings of distrust she developed due to her experiences at CRLA, shed light on why she did not report the alleged sexual assaults earlier, and why she did not initially respond to Detective Jackson's inquiries. That testimony, along with her explanation of her reasons for testifying, undercut defense counsel's theory that she was testifying against Bathum because he had refused her request for money. Further, her testimony regarding her negative feelings following the Summer Hill incident refuted the defense's theory that she consented to the sexual acts that took place there. Therefore, her testimony above was relevant, as it bolstered her credibility and disproved one of Bathum's defenses.

Similarly, the strong negative feelings Stephanie, Amanda, and Ruah experienced relating to their involvement in sexual acts with Bathum and/or their drug use while at CRLA refuted the defense's theory that they sought Bathum out to seduce, manipulate, or otherwise take advantage of him to get drugs and money. Therefore, their testimony was relevant because it tended to disprove one of Bathum's overarching theories of the case.

The prosecution's questions about the witnesses' feelings, and the witnesses' responses to those questions, were fairly brief. Except for Hayley's explanation of her reasons for testifying, each of the witness's answers was, at most, a few sentences. And, despite being the longest response, Hayley's explanation only

73

spanned about one page of reporter's transcript. The testimony at issue was adduced at the end of each the witnesses' testimony on direct or redirect examination, *after* they had already testified at length and in detail about the events underlying the charges against Bathum.

Under these circumstances, it would have been well within the trial court's discretion to find the probative value of the testimony was not substantially outweighed by the risk of undue prejudice. Therefore, we conclude the trial court did not err by failing to exclude the evidence under Evidence Code section 352, that the prosecution did not engage in misconduct by presenting the evidence, and that defense counsel's failure to object to the evidence did not constitute deficient performance resulting in prejudice.

Further, even assuming, *arguendo*, the trial court erred by admitting the testimony discussed above, we would find no prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836-838 (*Watson*). Here, the evidence of Bathum's guilt was overwhelming. Each of the alleged victims testified in substantial detail about his crimes. In addition to corroborating one another, their testimony was also corroborated by other evidence, including the testimony of other witnesses, such as family members and law enforcement. Under these circumstances, we conclude the asserted error would have been harmless beyond a reasonable doubt, and it is not reasonably probable that the trial court's exclusion of the testimony at issue would have resulted in a more favorable outcome for Bathum. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

# XI. Whether Multiple Convictions and Multiple Punishments are Permissible Under Business and Professions Code Section 729, Subdivision (b)(3)

Bathum contends "[a]ll convictions and each sentence for violation of [Business and Professions Code] section 729, save one, must be stricken[ ]" because under section 729, subdivision (b)(3), he "may suffer but a single conviction[ ] and a single sentence[ ]" for engaging in acts of sexual exploitation with multiple victims. As discussed below, we are not convinced by his argument.

## A. Relevant Statutory Provisions

As noted above, Business and Professions Code section 729, subdivision (a) provides, in relevant part: "[A]ny person holding himself . . . out to be a . . . psychotherapist[ ] or alcohol and drug abuse counselor, who engages in an act of sexual intercourse, sodomy, oral copulation, or sexual contact with a patient or client, . . . is guilty of sexual exploitation . . . ."

Section 729, subdivision (b) states: "Sexual exploitation . . . is a public offense:

"(1) An act in violation of subdivision (a) shall be punishable by imprisonment in a county jail for a period of not more than six months, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

"(2) Multiple acts in violation of subdivision (a) with a single victim, when the offender has no prior conviction for sexual exploitation, shall be punishable by imprisonment in county jail for a period of not more than six months, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

"(3) An act or acts in violation of subdivision (a) with two or more victims shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, and a fine not exceeding ten thousand dollars ($10,000); or the act or acts shall be punishable by imprisonment in a county jail for a period of not more than one year, or a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine.

"(4) Two or more acts in violation of subdivision (a) with a single victim, when the offender has at least one prior conviction for sexual exploitation, shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, and a fine not exceeding ten thousand dollars ($10,000); or the act or acts shall be punishable by imprisonment in a county jail for a period of not more than one year, or a fine not exceeding one thousand dollars ($1,000), or both that imprisonment and fine.

"(5) An act or acts in violation of subdivision (a) with two or more victims, and the offender has at least one prior conviction for sexual exploitation, shall be punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of 16 months, two years, or three years, and a fine not exceeding ten thousand dollars ($10,000)."

## B.    Analysis

"The proper interpretation of a statute is a question of law we review de novo. [Citations.] "''"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning."'"" [Citation.]

"'[W]e look to the 'entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) Interpretations leading to absurd results are to be avoided. (*People v. Loeun* (1997) 17 Cal.4th 1, 9.)

Applying these well-settled principles, we reject Bathum's contention that a defendant who violates section 729 with multiple victims may suffer only one conviction and one sentence. Section 729, subdivision (a) sets forth the elements of sexual exploitation. Thereafter, and of particular relevance here, subdivision (b) provides the offense may be punishable as a misdemeanor or felony, depending on whether certain facts have been proven alongside the elements described in subdivision (a). (See Bus. & Prof. Code, § 729, subd. (b); see also *Applied Materials v. Workers' Comp. Appeals Bd.* (2021) 64 Cal.App.5th 1042, 1075-1076.) Subdivision (b)(1) specifies the sentence for a first-time offender who commits a single act of sexual exploitation with one person. (Bus. & Prof. Code, § 729, subd. (b)(1).) Subdivision (b)(2) and (b)(3), respectively, set forth the sentences for first-time section 729 offenders who have either committed multiple acts of sexual exploitation with a single victim (*id.* subd. (b)(2)), or who have committed "[a]n act or acts" of sexual exploitation with two or more victims (*id.*, subd. (b)(3)). Subdivision (b)(4) and (b)(5), respectively, specify the sentences for those who have sustained at least one prior sexual exploitation conviction, and who have either engaged in multiple acts of sexual exploitation with a single victim (*id.*, subd. (b)(4)),

77

or who have committed "[a]n act or acts" of sexual exploitation with two or more victims (*id.*, subd. (b)(5)).

Accordingly, based on its plain language, subdivision (b)'s purpose is to provide for punishments of varying severity based on the number of violations committed, the number of people involved in those violations, and whether the defendant has prior convictions under the statute. (See Bus. & Prof. Code, § 729, subd. (b).) Nothing in section 729 states or otherwise suggests that a defendant who violates the statute with multiple victims may be subjected to only a single conviction and required to serve a single sentence.[11] (See *id.*, § 729.) We therefore conclude Bathum's "interpretation [of section 729] is not supported by [its] plain language . . . , and we are not persuaded to engraft the limitation he seeks onto the words of the Legislature." (*People v. DeSimone* (1998) 62 Cal.App.4th 693, 698.)

Moreover, we note Bathum's interpretation of section 729 would lead to absurd results. As the Attorney General points out, were we to accept his contention, once a defendant commits a single violation of the statute, he could then commit further violations against numerous other victims with impunity. This would undermine section 729's overarching purpose of deterring sexual exploitation by the persons identified in section 729, subdivision (a), and protecting potential victims. Consequently, for this additional reason, Bathum's argument is unavailing.

---

11 Nor does section 729 contain any language permitting only one conviction and one sentence for a defendant who commits multiple acts with a single victim. (See Bus. & Prof. Code, § 729.) Consequently, we also reject Bathum's challenge to his convictions on counts 18 and 19 mentioned in footnote 8, *ante*.

## XII. Admission of Testimony on Certain Topics by Amy W., Mollie W., Erika B., and Erika L.

### A. Relevant Background

As discussed below, Bathum challenges the admissibility of certain testimony of Mollie W., Erika B., Erika L.,[12] and Amy W., which did not pertain to the incidents in which he gave them drugs. We summarize the disputed testimony here.

Amy W. testified she attended several group sessions at CRLA, including a trauma group facilitated by Bathum. Amy recalled that, during group sessions, Bathum asked clients to share information about their parents and their relationships with them. She did not remember other therapists or counselors being present at the groups led by Bathum. Although she was not aware whether Bathum had any credentials to lead those groups, she had the impression he had "some type of clinical therapist-type credentials[.]" When asked why she believed he had those credentials, she explained Bathum used clinical vocabulary while speaking "about therapy-type issues[,]" which made him sound "educated and intelligent and like he knew what he was talking about."

Similarly, Mollie and Erika B. both testified they participated in a trauma group facilitated by Bathum, where he asked them and other participants to share personal information, such as the nature of their relationships with their parents. Mollie testified Bathum asked follow-up questions, gave participants feedback and advice, and sympathized with them. She did not believe he had any credentials based on his role in

---

12    Erika L.'s testimony formed the basis of count 44, on which Bathum was found not guilty.

the group. Erika B., however, testified Bathum "acted like a therapist" based on his behavior during the group.

Erika B. testified Bathum pulled her aside after one of the trauma group sessions. He told her he felt drawn to her case because of her relationship with her father and offered to provide her one-on-one therapy to help her work through her issues. She declined Bathum's offer "because [she] didn't get a good vibe."

Erika L. testified she had contact with Bathum multiple times between 2015 and 2016. Over a relevance objection by defense counsel, she testified their interactions became sexual in nature on three occasions.

First, while in a hotel room one night, Bathum asked her to get onto the bed and sit in front of him while he tried to hypnotize her. As he did so, he said, "'You are going to surrender to me. You are going to be comfortable[.]'" Ultimately, Bathum did not hypnotize her, and nothing more came out of the incident. Second, while sitting in Bathum's car together, he kissed her hand and said, "'Is it okay if I do something like that?'" She testified she "didn't want him to do that." Lastly, over defense counsel's objection and motion to strike, Erika L. testified that during a conversation over Facebook Messenger, Bathum told her "how he was really horny and watching a bunch of porn that morning[.]"

## B.    Analysis

Bathum appears to contend his convictions must be reversed because the trial court erred by failing to exclude the testimony above under Evidence Code section 352. He argues the evidence was irrelevant, cumulative, and overly prejudicial, as it "had nothing to do with the [drug furnishing] charges[ ]" relating

to those witnesses, and distracted the jury from the issues pertaining to Bathum's guilt of those crimes.

We reject Bathum's argument. Again, we note defense counsel did not object to any of the testimony above under Evidence Code section 352. Consequently, his contentions have been forfeited. (*People v. Williams*, *supra*, 16 Cal.4th at p. 206.) In any event, we conclude that even if counsel raised timely objections under the statute, it would have been well within the trial court's discretion to conclude the evidence's probative value was not substantially outweighed by any risk of undue prejudice.

At the outset, we note the disputed evidence was relevant to several issues at trial. (See Evid. Code, § 210.) As noted above, in defense of the charges against Bathum, defense counsel primarily sought to undermine the alleged victims' credibility and portray him as the victim of manipulation and seduction by those former CRLA clients. The testimony of the three witnesses above countered those efforts. Specifically, through testifying to Bathum's role in facilitating the trauma group, Amy, Erika B., and Mollie corroborated the testimony of the alleged victims of sexual exploitation, who each provided nearly identical accounts of his role in the group. Further, because their testimony was consistent with that of several other witnesses, Amy, Erika B., and Mollie also boosted their own credibility. Similarly, Erika L.'s testimony regarding Bathum's attempts to hypnotize her was consistent with the testimony by Brittni J., Amanda S., Jennifer I., and Ruah D., who each related Bathum also tried to hypnotize them. Her testimony therefore bolstered their credibility.

Bathum argues that despite being relevant, the testimony was unduly prejudicial and ran the risk of confusing the jury, because a victim may only testify to facts relating to the crimes in

which they were involved. We reject his contention for two reasons. First, Bathum has not cited—and we could not locate—any section of the Evidence Code or other pertinent legal authority supportive of his asserted rule. Second, his argument is inconsistent with the broad definition of relevance in Evidence Code section 210. Under that statute, evidence is relevant so long as it has "*any* tendency in reason to prove or disprove *any* disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.)

Accordingly, we conclude that, even if proper and timely objections had been made, it would have been well within the trial court's discretion to find the probative value of the testimony above was not substantially outweighed by the risk of undue prejudice. Therefore, the trial court did not err by failing to exclude the disputed evidence under Evidence Code section 352.

Further, even assuming, *arguendo*, the trial court erred by admitting the testimony at issue, we would find no prejudice under *Chapman*, *supra*, 386 U.S. at p. 24, or *Watson*, *supra*, 46 Cal.2d at pp. 836-838. As previously discussed, the evidence of Bathum's guilt was overwhelming. Consequently, the asserted error would have been harmless beyond a reasonable doubt, and it is not reasonably probable that the trial court's exclusion of the testimony at issue would have resulted in a more favorable outcome for Bathum. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

## XIII.  Instructional Error – CALCRIM. No. 375

### A.     Relevant Background

Ruah D. testified Bathum "offered [her] money to give Dana [R.] a hotshot." Although she did not know what a "hotshot"

82

was, she testified Bathum explained the term to her as follows: "When you put too much heroin in a shot and give it to somebody, or it's bad heroin to kill somebody."

The trial court instructed the jury on the principles relating to uncharged offenses or acts pursuant to CALCRIM No. 375. In so doing, the court stated, in relevant part:

"The People presented evidence that the defendant committed other offenses or other behavior that were not charged in this case.

You may consider this evidence only if the People have proved by the preponderance of the evidence that the defendant, in fact, committed the uncharged offenses or act. . . . .

If the People have not met this burden, you must disregard this evidence entirely.

If you decide that the defendant committed the uncharged offense or act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

The defendant was the person who committed the offenses alleged in this case;

Or the defendant actively acted with the intent required to prove the offenses in this case;

Or the defendant had a motive to commit the offenses alleged in this case;

Or the defendant acted with the required knowledge to prove the offenses alleged when he allegedly acted in this case;

Or the defendant had a plan or scheme to commit the offenses alleged in this case[.]"

During closing argument, the prosecution asserted Bathum attempted to silence witnesses who tried to speak out against him, and thereby exhibited consciousness of guilt. In so doing, the

83

prosecution referred to Ruah's testimony that he offered her money to give a hotshot to Dana.

## B. Analysis

Bathum contends the trial court erred in giving CALCRIM No. 375, and therefore violated his right to a fair trial and due process, by: (1) failing to specify the uncharged offense at issue was murder-for-hire and instructing the jury of its elements; and (2) by "fail[ing] to tailor [the instruction] by deleting reference to theories of relevance for which the evidence wasn't admitted." He further asserts that, to the extent these claims have been forfeited, defense counsel was ineffective by failing to request those modifications to the instructions.

At the outset, we note Bathum's instructional error claim has been forfeited, as defense counsel did not ask the trial court to modify CALCRIM No. 375. (See *People v. Orloff* (2016) 2 Cal.App.5th 947, 958.) Even if counsel had done so, however, Bathum's argument fails. As the Attorney General points out, our Supreme Court rejected a similar argument in *People v. Letner and Tobin, supra,* 50 Cal.4th 99. There, the defendants argued the trial court's instruction under CALJIC No. 2.50, which is nearly identical to CALCRIM No. 375, "was erroneous because it failed to identify precisely which other-crimes evidence had been admitted." (*People v. Letner and Tobin, supra,* at p. 190.) In holding their contention was misplaced, the court explained: "We have held that in order to avoid confusion in a case in which evidence of a defendant's criminal activity includes not only convictions admitted to impeach the defendant's own testimony, but also other-crimes evidence admitted under section 1101, subdivision (b) of the Evidence Code, the trial court must specify which evidence is referred to in the CALJIC No. 2.50 instruction

84

given to the jury. [Citations.] There was no possibility of such confusion in the present case, because no criminal impeachment evidence was offered. Therefore, the trial court's instruction remained 'properly neutral and objective' by not referring to particular crimes." (*Ibid.*)

Here, as in *People v. Letner and Tobin*, "no criminal impeachment evidence was offered[,]" because Bathum did not testify at trial. (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 190.) Thus, we likewise conclude he has not shown reversible error based on the trial court's "fail[ure] to identify precisely which other-crimes evidence had been admitted." (*Ibid.*)

In any event, any error by the trial court in failing to specify the uncharged offense referenced in the instruction and/or in failing to tailor the instruction for the applicable purposes for which it may be considered was harmless. As discussed above, the evidence of Bathum's guilt was overwhelming. Therefore, we conclude "it is not reasonably probable that a result more favorable to [Bathum] would have been reached absent the alleged instructional error." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669, citing *Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

In sum, for the reasons discussed above, we reject Bathum's claims of instructional error and ineffective assistance of counsel based on the administration of CALCRIM No. 375.

## XIV. Instructional Error – CALCRIM. No. 3181

### A. Relevant Background

In giving CALCRIM No. 3181, the trial court stated, in relevant part: "If you find the defendant guilty of two or more sex offenses as charged in the counts alleging sex crime violations, you must then decide whether the People have proved the

additional allegation that those crimes were committed against more than one victim."

## B. Analysis

Bathum contends the trial court erred in giving CALCRIM No. 3181 because "it failed to clarify [the instruction] only applied to [Business and Professions Code] section 729 sex crimes violations." He therefore argues that, due to the "misleading" instruction, the jury may have improperly considered the forcible sex acts involving Hayley, which did not form the basis of the sexual exploitation charges, in deciding whether he violated section 729 with more than one victim. Thus, he contends the "[t]rue findings on each multiple victim allegation [accompanying his sexual exploitation convictions] must be stricken." In addition, he argues that to the extent his claim of instructional error has been forfeited, defense counsel was ineffective in failing to seek clarification of the instruction.

Bathum's contention is meritless. As the Attorney General correctly points out, defense counsel did not request clarification of the instruction at trial. Therefore, Bathum has forfeited his claim of instructional error. (See *Covarrubias*, *supra*, 1 Cal.5th at pp. 876-877.) In any event, any vagueness in the instruction was harmless. Again, as the Attorney General observes, the jury found Bathum guilty of 10 counts of sexual exploitation relating to 7 victims, of which Hayley was only one. Under these circumstances, we conclude the jury's true findings on the multiple-victim allegations were proper. Accordingly, we reject Bathum's claim of instructional error and ineffective assistance of counsel based on the trial court's administration of CALCRIM No. 3181.

## XV. Whether Certain Technical Errors in the Record Must be Corrected

Lastly, Bathum asks that a few technical errors in the record be corrected. First, he notes the verdict forms relating to counts 9, 11, 12, 16, 18, 19, 22, 27, 32, 33, 34, and 49 erroneously identify Business and Professions Code section 729, subdivision (a)(3), which does not exist, as the statute under which the jury found the multiple victims allegations to be true. He asserts these forms should be corrected to reflect the jury's findings were made under section 729, subdivision (b)(3).

Next, Bathum claims the trial court misspoke in summarizing his sentence on some of the sexual exploitation counts. He points out that in volume 15 of the reporter's transcript at pages 11116-11117, the court stated: "[S]o the court's sentence will be 16 months as the base term on count 11, then eight months each of one[-]third the mid[-]term for counts 18, 22, 27, 32, and 49. That would be a total of 56 months, which would be four years, eight months on those counts. [¶] All . . . the remaining counts [under Business and Professions Code section 729] that the court has not enumerated, would be high term [of] three years on each count, as the court has previously indicated, *consecutive*." (Italics added.) He notes, however, that on pages 11113-11114, the court previously stated Bathum's sentences on "[c]ounts 9, 12, 16, 19, 33, and 34 will be the high term of three years but *concurrent* with the sentence." (Italics added.) Asserting one may only calculate his total sentence to be 52 years and 8 months if his sentences on counts 9, 12, 16, 19, 33, and 34 are served concurrently with his other sentences, he contends the court's remarks on page 11117 should be corrected to be consistent with its comments on pages 11113 and 11114.

The Attorney General does not object to Bathum's requests for corrections to the record, and we see no reason to deny them. Accordingly, we hereby order the trial court to correct the record as Bathum has requested. (Cal. Rules of Court, Rule 8.841(b)(1).)

## DISPOSITION

The judgment is affirmed. Upon issuance of the remittitur, the trial court is instructed to correct the technical errors in the record identified in section XV this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J.

We concur:

COLLINS, Acting P.J.

STONE, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.